**2026 IL 131565**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 131565)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. MICHAEL McCOY, Appellant.

*Opinion filed March 19, 2026.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Overstreet, Cunningham, and O'Brien concurred in the judgment and opinion.

Justices Rochford and Tailor took no part in the decision.

## OPINION

¶ 1 In 1989, a jury convicted petitioner, Michael McCoy, of first degree murder and armed robbery for the 1986 killing of Nazih Youssef and robbery of a liquor store, for which the Cook County circuit court sentenced him to life imprisonment.

¶ 2 Years later, following an unsuccessful direct appeal and numerous attempts to obtain postconviction relief, the circuit court granted petitioner leave to file the instant successive postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)).

¶ 3 Following the third-stage evidentiary hearing, the circuit court denied his successive postconviction petition, finding petitioner failed to establish a claim of actual innocence where the affidavit and testimony from petitioner's codefendant was not credible and that (1) the expert eyewitness testimony regarding the unreliability of witness identifications and (2) expert testimony as to the presumptiveness of the procedure used to test for blood and the high risk of false positives were not of such a conclusive character that it would probably change the result on retrial. Upon review, the appellate court found the circuit court neglected to consider all the evidence together, as it should have, but ultimately affirmed the circuit court's denial of petitioner's successive postconviction petition. 2025 IL App (1st) 240198-U, ¶¶ 14, 21.

¶ 4 On appeal before this court, petitioner argues the courts below erred in denying his successive postconviction petition following a third-stage evidentiary hearing. Petitioner asserts that, during the hearing, the circuit court failed to consider the old and new evidence as a whole, made subjective credibility determinations, and required petitioner to do more than refute the State's case to establish actual innocence. For the following reasons, we affirm.

¶ 5                                    I. BACKGROUND

¶ 6 The appellate court on direct appeal provided a comprehensive account of the facts in this case (see *People v. McCoy*, 238 Ill. App. 3d 240 (1992)), and the lower courts set forth the procedural history leading up to the current successive postconviction petition at issue in this appeal (see *People v. McCoy*, No. 86 CR 10404-02 (Cir. Ct. Cook County, Jan. 6, 2022); *People v. McCoy*, 2023 IL App (1st) 220148; 2025 IL App (1st) 240198-U). For the present appeal, we repeat only the facts and procedural history relevant to address the issue before us.

¶ 7                          A. Circuit Court Proceedings and Direct Appeal

¶ 8        At the September 1989 jury trial, the evidence showed the events that led to petitioner's convictions occurred over the course of the late evening of April 9 and early morning of April 10, 1986. At that time, Hussein Awwad worked as a cashier at a liquor store in Chicago, Illinois, owned by Nazih Youssef. Awwad testified that on the night of April 9, 1986, at approximately 11 or 11:30 p.m., he was working at the store with Youssef, Mohammed Ghrayyib, and Achmaad Hassan when he observed two people he knew enter the store, buy some liquor, drink inside the store and "bother[ ] the customers, especially the women." Awwad testified that he recognized one of the people as Wayne Millighan, who was fired from the store a few days earlier for not working but instead watching where the cash was kept. Awwad recognized the other person with Millighan and identified petitioner as that person in court. He stated he spoke with petitioner that night and that petitioner had been in the store on at least three previous occasions. Awwad testified that he told Youssef the two were bothering customers and he should call the police on them, but Youssef did not want any trouble.

¶ 9        A little while later, around 1 a.m. on April 10, 1986, Awwad was in the stockroom, and Ghrayyib, another witness, was working in the grocery section near a cash register, making coffee. Youssef was in the liquor section at the back of the store, and another employee, Hassan, was in the walk-in beer cooler. Awwad heard a "great" noise at a locked door that separated the counter from the lobby area. He proceeded to the front of the store toward the noise, and as he approached Ghrayyib, who called for him, he saw Millighan holding a small silver firearm and heard him announce a stick-up. Millighan ordered Ghrayyib to open the cash register, and once he did, Millighan grabbed the entire tray from the cash register and started taking money. Awwad then heard a gunshot, which came from the liquor section. In response, Millighan said, "come on, let's go, we are done." Millighan and another offender left the store, and then Awwad observed the shooter exiting the liquor section, holding a dark, long-barreled revolver and a bag of the type used to hold money. Awwad testified he had seen the shooter before and identified him as petitioner, whom he saw in the store earlier in the night. Awwad stated the inside of the store was well lit and that, as petitioner exited the store, he walked right in front of him, "about four to five feet away."

¶ 10        Subsequently, Awwad went to the back of the store and found Youssef lying on the floor covered in blood. Awwad called the police. A few days later, on April 12, 1986, Awwad went to the police station with Ghrayyib and Hassan but separately identified petitioner at a lineup as the person who left the store on the night of the shooting with the black revolver, coming from the area of the shooting. He also identified petitioner in court as that man. On July 24, 1986, he identified Millighan in a lineup.

¶ 11        Ghrayyib substantially corroborated Awwad's testimony. He also emphasized that he saw the shooter clearly as he exited the store, carrying a black .38-caliber revolver. Ghrayyib stated that, after the shooting when the police arrived, Awwad spoke with police, as there was a language barrier and he spoke better English. Following the shooting, Ghrayyib testified that he was shown a black-and-white photo array separately from Awwad and Hassan and recognized petitioner in the photo array. A police officer later testified that Ghrayyib did not view the black-and-white photo array because, when it was set in front of him, he preferred to see a colored photograph array, which police did not have. A few days later on April 12, 1986, Ghrayyib went to the police station with Awwad and Hassan but stated that they each viewed a lineup separately, where he identified petitioner as the shooter. He also identified petitioner in court. In July 1986, he identified Millighan in a lineup.

¶ 12        Hassan, who was in the cooler area during the shooting, verified that Millighan previously worked at the store and the events that took place around 11 p.m. on the night of the shooting, After the shooting, Hassan identified Millighan from a photo array and identified, separately from Ghrayyib and Awwad, petitioner as one of the people drinking inside the store prior to the shooting. He also identified petitioner in court and Millighan in a lineup.

¶ 13        A police detective testified that, shortly after the shooting, he spoke with three witnesses but only Ghrayyib and Awwad gave a description of the shooter. Specifically, the detective stated,

        "From Mr. Ghrayyib and Mr. Awwad, the description was a male Black, 25 to 30 years of age, five feet six to five feet eight, dark complected 160 to 190 pounds, a mustache. He was wearing a black sports cap, a black leather jacket, waist-length, waist jacket, blue jeans.

They described the man as having a gold earring, and possibly in his left ear or on his left ear. And they thought it was an ear piercing earring, or pierced earring.

They also described him as carrying a dark longer barrel four—or revolver, pistol, handgun."

¶ 14 The detective also testified that Ghrayyib told him that the shooter kicked in a door. A crime laboratory examiner analyzed the shoe print left on the door but determined it did not match the shoes petitioner was wearing when arrested.

¶ 15 Two days after the shooting, police officers arrested petitioner, who matched the physical description provided by the witnesses. At the time of his arrest, petitioner was 24 years old, 5 feet, 9 inches in height, weighed 170 pounds, and had a gold earring in his left ear.

¶ 16 Police officer Rick Roberts testified as an expert in forensic serology. Officer Roberts received petitioner's gym shoes and a vial of the victim's blood. Officer Roberts testified that he performed a "preliminary chemical test for the presence of blood" on the gym shoes and the test was positive. However, the "amount of sample was insufficient for any further testing." On cross-examination, Officer Roberts agreed that the preliminary test he conducted on the shoes could not determine whether the blood was from a human or animal.

¶ 17 An assistant medical examiner testified that he performed an autopsy on Youssef and his cause of death was a close-range gunshot to the left side of the victim's head. An officer testifying as an expert in firearms identification described the bullet that killed the victim as a .38-caliber, shot from a revolver.

¶ 18 The jury found petitioner guilty of first degree murder and armed robbery, and the circuit court subsequently sentenced petitioner to concurrent terms of life imprisonment for first degree murder and 30 years' imprisonment for armed robbery. The appellate court affirmed the circuit court's convictions and sentence on direct appeal. See *McCoy*, 238 Ill. App. 3d 240.

¶ 19                        B. Prior Postconviction Proceedings

¶ 20        Since petitioner's direct appeal, he has pursued numerous state and federal postconviction remedies, including three petitions for postconviction relief: one in 1997 and two in 2000.

¶ 21        In 1997, petitioner filed an initial *pro se* postconviction petition, alleging, in relevant part, actual innocence based on newly discovered evidence of eyewitness testimony and that his counsel provided ineffective assistance by not interviewing or calling those eyewitnesses to testify at trial. Specifically, the petition included an affidavit from Thomas Shanklin, who claimed that petitioner did not shoot the owner of the liquor store on April 10, 1986. Shanklin further averred that he observed five men, not including petitioner, and that Howard Reed admitted to Shanklin that he shot the owner. The circuit court summarily dismissed petitioner's *pro se* postconviction petition. Petitioner filed a motion to reconsider, which the court denied. On appeal, appointed counsel moved to withdraw, representing that "there are no arguable bases for collateral relief and [petitioner's] petition was untimely filed." The appellate court granted counsel leave to withdraw and affirmed the circuit court's judgment. See *People v. McCoy*, 294 Ill. App. 3d 1100 (1998) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 22        In March 2000, petitioner filed a second *pro se* postconviction petition,[1] alleging, in relevant part, ineffective assistance of counsel where appellate counsel failed to appropriately brief and argue the issues on appeal, such as a claim of actual innocence previously raised in petitioner's first postconviction petition. The circuit court summarily dismissed the petition as frivolous and patently without merit, and the appellate court affirmed the summary dismissal. See *People v. McCoy*, 326 Ill. App. 3d 1156 (2002) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 23        In August 2000, while petitioner's appeal from the dismissal of his second petition was still pending, petitioner filed a third *pro se* postconviction petition, alleging that the circuit court improperly dismissed his initial postconviction petition based on untimeliness and, therefore, the prior proceeding was

---

[1]The lower courts classify petitioner's second and third *pro se* postconviction petitions as successive postconviction petitions.

fundamentally deficient and his claim of actual innocence was never addressed. Petitioner further argued that his claim of actual innocence was not raised in his second postconviction petition because the law limiting the court's ability to dismiss a petition as untimely filed was not yet "published." The circuit court summarily dismissed petitioner's third *pro se* postconviction petition, finding there was no basis upon which to consider the petition because the prior proceedings were not deficient, as the court properly dismissed his initial petition as untimely in accordance with the law. The court further stated that his claim of actual innocence based on newly discovered evidence was raised earlier in both his original postconviction petition and motion for reconsideration and therefore was barred by *res judicata*. Petitioner filed a motion to reconsider, which the circuit court denied. The appellate court affirmed. See *People v. McCoy*, 355 Ill. App. 3d 1185 (2005) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 24    In 2008, petitioner filed a motion to produce, pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2008)), requesting that an order be entered directing the production of petitioner's shoes that were previously tested for fluids and the vial of the deceased's blood that was taken from the deceased, for the purpose of making said items available for forensic comparison with blood recovered from petitioner's shoes. In 2013, the circuit court granted petitioner's section 116-3 petition to have DNA testing performed on his inventoried shoes. An August 2013 Illinois State Police laboratory report noted the findings related to the shoes as "[p]reviously examined for the presence of blood. No blood indicated." The report further stated the victim's blood was "[n]ot examined."

¶ 25                    C. Instant Successive Postconviction Petition
                                         and Proceedings

¶ 26    In December 2014, petitioner filed a motion for leave to file a successive postconviction petition pursuant to the Act (725 ILCS 5/122-1 *et seq.* (West 2014)). In December 2015, the circuit court granted petitioner leave to file a successive postconviction petition.

¶ 27    In January 2019, petitioner filed the instant successive postconviction petition. Therein, petitioner alleged (1) actual innocence, supported by an affidavit from

- 7 -

Millighan, averring that Howard Reed was the shooter in the robbery and that petitioner was not involved in the crime; (2) a *Brady* violation where prosecutors failed to disclose material exculpatory serology evidence (see *Brady v. Maryland*, 373 U.S. 83 (1963)); (3) ineffective assistance of trial and appellate counsel for their failures to uncover the evidence at issue in claims one and two; and (4) cumulative error. In response, the State filed a motion to dismiss, asserting petitioner failed to allege a substantial constitutional violation in that petitioner failed to demonstrate (1) actual innocence, (2) a *Brady* violation, and (3) a substantial showing of ineffectiveness of trial or appellate counsel.

¶ 28    In November 2020, petitioner filed a combined supplement to his successive postconviction petition and response to the State's motion to dismiss. In the supplement, petitioner included further evidence in support of his innocence, which included (1) an expert affidavit by Deanna Lankford clarifying the presumptiveness of the procedure used to test for blood on petitioner's shoes and the high risk of false positives, (2) an expert affidavit from Dr. Nancy Franklin regarding the unreliability of the eyewitness identifications, and (3) the criminal history of Howard Reed indicating a *modus operandi* consistent with this crime.

¶ 29    In January 2022, the circuit court conducted a second-stage review of petitioner's successive postconviction petition, the supplement, and the State's motion to dismiss. The court determined petitioner had not shown that any of the four claims should advance to the third stage where the successive postconviction petition and the accompanying documents failed to make a substantial showing of a constitutional violation. Accordingly, the court dismissed the successive postconviction petition.

¶ 30    On appeal, petitioner contested only the circuit court's ruling on his actual innocence claim. *McCoy*, 2023 IL App (1st) 220148, ¶ 7. The appellate court reversed, finding petitioner made a substantial showing of actual innocence where, at the second stage, the circuit court was required to accept Millighan's proffered testimony in his affidavit as true. *Id.* ¶¶ 14, 16. Thus, the court determined the successive postconviction petition was sufficient to advance to a third-stage evidentiary hearing and remanded for a hearing on the merits of the actual innocence claim. *Id.*

¶ 31    At the August 2023 third-stage evidentiary hearing, petitioner's counsel conceded during opening arguments that, on the night of the shooting in April 1986, both Millighan and petitioner were in the liquor store around 11 p.m., but counsel claimed that petitioner was not at the store later during the robbery. Petitioner then presented testimony from (1) Millighan, who testified that he, not petitioner, was one of the robbers, and Millighan identified a man named Howard Reed as the true shooter; (2) Dr. Franklin, an expert on eyewitness identification and memory, opining that the testimony of the eyewitnesses was unreliable; and (3) Lankford, an expert testifying about the presumptive testing of blood. Petitioner also presented numerous related documents.

¶ 32    Millighan testified that he was diagnosed with Parkinson's disease three years earlier and it did not affect his memory. Millighan admitted that he previously worked at the liquor store and was involved in and convicted of the April 1986 murder of Youssef. Millighan stated that he participated in the robbery along with men named "Buck," "Geno," and Howard Reed. He did not know Buck's or Geno's last names but stated that they along with Reed were all dead. According to Millighan, Reed was the one who entered the back of the store and shot Youssef.

¶ 33    Millighan testified that he knew petitioner at the time of the robbery as someone "from the neighborhood." Millighan admitted to being in the liquor store earlier in the night on the night of the shooting, but he claimed he did not see petitioner on the night of the shooting and that petitioner was not involved in the robbery.

¶ 34    Millighan acknowledged that he lied when he professed innocence in his trial and in subsequent postconviction proceedings, which he explained was motivated by a desire "to go home." Millighan stated he was released from prison in 2019 before completing his full sentence. Millighan admitted he never claimed that petitioner was innocent until after he had a conversation with petitioner while in the prison yard in 2010.

¶ 35    Petitioner also presented testimony from Dr. Franklin, an expert on eyewitness identification and memory. Dr. Franklin testified that the eyewitnesses' identification of petitioner as the shooter "are very likely to have been produced through post-event influences and are at high risk of being inaccurate." She explained her conclusion was based on the fact that the eyewitnesses only observed the shooter for a short period of time, the observations occurred in the presence of

multiple guns during a high-stress event in which their friend had been shot, the shooter was wearing a hat, and the shooter was of a different race. Dr. Franklin stated the fleeting view alone would lead to a low likelihood of reliable information, especially when followed by "exposure to highly-biasing influences, specifically biasing toward [petitioner], and in the context, potentially, of one or both of those people who had seen the shooter having made a non-identification of the black-and-white photo array, which would be diagnostic of innocence." Thus, Dr. Franklin opined that,

> "by the time they got to the live lineup, they were presented with an [inadequate] number of members of the live lineup, only one of whom was wearing the same type of clothing that the witnesses had described the shooter as wearing. And that produces a very high risk of what's referred to as clothing bias in the research."

Dr. Franklin noted she made a few errors in her report, including that, "in reviewing the case over the past week, [she determined] that none of the eyewitnesses reviewed any color photos involving [petitioner]. [Instead, she] misattributed the photo arrays that were discussed multiple times to the wrong suspect," but her errors did not change her conclusions.

¶ 36     Petitioner also presented expert testimony from Lankford, a forensic caseworker director at Bode Technologies, which performs forensic tests and analysis for the Illinois State Police. Lankford testified she had not performed any tests in petitioner's case but she reviewed reports from tests that had been conducted by others, which included the original 1986 laboratory report by Officer Roberts that tested the substance on petitioner's gym shoes, as well as a report of a 2013 test on the same substance. Lankford also reviewed Officer Roberts's trial testimony. Lankford stated that Officer Roberts performed an "ortho-tolidine test" on petitioner's shoes, which is a "presumptive test for the presence of blood" that is "very sensitive." Lankford acknowledged that Officer Roberts only performed a preliminary test on the shoes because "there simply wasn't enough left on the gym shoe to test any further." While Lankford recognized that Officer Roberts testified at trial that his test was preliminary, she opined that the substance should not have been referred to as "blood" but rather "possibly blood." As for the 2013 test results

on the same substance, Lankford testified the results mean that "there was no blood present or there was not enough blood present to detect."

¶ 37        In addition to the testimony of Millighan, Dr. Franklin, and Lankford, petitioner also introduced documents concerning Howard Reed, including arrest reports and a booking photograph.

¶ 38        Following the evidentiary hearing and argument from the parties, the circuit court denied petitioner's successive postconviction petition. The court first noted that Howard Reed's "height was consistently reported time and time again as being six feet zero inches. Mr. Reed's height does not match the description of the shooter in this case." The court also found that Millighan's affidavit and testimony at the hearing were positively rebutted by his testimony at his trial, where he denied being involved in the robbery at the liquor store and any knowledge of the shooter. The court further stated that the trial testimony of both Awwad and Ghrayyib identifying petitioner as the shooter, with Hassan identifying petitioner as one of the people drinking in the store prior to the shooting, was "positive, consistent, clear and credible."

¶ 39        The court determined Millighan's testimony and affidavits lacked credibility; he is a convicted murderer, who has now completed his prison sentence, and therefore, his affidavit and testimony were "not of such a conclusive character that it will probably change the result on retrial."

¶ 40        As to Dr. Franklin's testimony and affidavit, the court noted that Dr. Franklin did not observe the witnesses testifying at trial or interview them and was instead basing her opinion on photographs, police reports, and trial transcripts. The court determined that the "witnesses were questioned extensively on direct and cross-examination before the jury regarding their observations, descriptions, and identifications." Therefore, the court found, because the issue of identification was thoroughly addressed in closing arguments by both parties, the affidavit and testimony of Dr. Franklin was not of such a conclusive character that it would probably change the result on retrial.

¶ 41        The court also reviewed Lankford's testimony regarding the "possible" presence of blood on petitioner's shoes and determined, "in view of the

overwhelming evidence of guilt presented in this case," Lankford's testimony was not of such a conclusive character that it would probably change the result on retrial.

¶ 42 Ultimately, the court stated, "[p]etitioner's claim of actual innocence based on newly discovered evidence, a *Brady* violation, and effective assistance of trial counsel and appellate counsel all fail individually and collectively." The court in reaching its conclusion "considered all the claims, arguments, filings, trial transcripts, the facts contained within the record, as well as the testimony, exhibits presented at the third-stage evidentiary hearing" to find the "evidence of actual innocence is not of such a conclusive character that it would probably change the results of the petitioner upon retrial." Accordingly, the court determined petitioner's filings and evidence presented at the evidentiary hearing failed to establish by a preponderance of the evidence denial of his constitutional rights.

¶ 43 The appellate court affirmed the circuit court's denial of petitioner's successive postconviction petition. 2025 IL App (1st) 240198-U, ¶ 21. The court found that, while the circuit court did not consider all of the evidence together as it should have, Millighan's testimony lacked credibility and, without that evidence, the testimony of Dr. Franklin regarding the alleged unreliability of the witness identifications and Lankford's testimony definitively excluding the presence of blood on petitioner's shoes would not be enough to probably change the result on retrial. *Id.* ¶¶ 14, 20. The court concluded that petitioner's "actual innocence claim was reliant on the credibility of Millighan, and the determination of his credibility was a matter for the circuit court to decide." *Id.* ¶ 21. Thus, the appellate court found him not credible and stated that petitioner had not demonstrated that the court's credibility determination was manifestly erroneous. *Id.* Without the key evidence, the court determined that petitioner could not show that there would probably be a different result on retrial. *Id.*

¶ 44 We allowed petitioner's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Dec. 7, 2023).

¶ 45 II. ANALYSIS

¶ 46 In this appeal, petitioner argues the courts below erred in denying his successive postconviction petition where the circuit court failed to consider the old and new

evidence collectively, made subjective credibility assessments, and required petitioner to do more than refute the State's case to establish actual innocence. The State disagrees and contends that the lower courts properly held that petitioner's actual innocence claim is meritless.

¶ 47                      A. Successive Postconviction Petitions

¶ 48      The Act provides a statutory remedy for an imprisoned person asserting a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both. 725 ILCS 5/122-1(a)(1) (West 2014). "The Act is not a substitute for an appeal but offers a mechanism for a criminal defendant to assert a collateral attack on a final judgment." *People v. Robinson*, 2020 IL 123849, ¶ 42. While only one postconviction proceeding is contemplated under the Act (see 725 ILCS 5/122-1(f) (West 2014)), fundamental fairness requires relaxation of the statutory bar against successive proceedings on two grounds. *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002). The two grounds that allow a petitioner to file a successive postconviction petition with leave of the circuit court are where the petitioner (1) can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding or (2) asserts a fundamental miscarriage of justice based on actual innocence. *Robinson*, 2020 IL 123849, ¶ 42.

¶ 49      Prior to initiating a successive postconviction petition, a petitioner must obtain leave of court. *Id.* ¶ 43. For petitioners seeking to file a successive petition based on a claim of actual innocence, "[i]f leave to file is granted, a successive petition is docketed for second-stage proceedings, at which the petitioner must make a substantial showing of actual innocence to warrant an evidentiary hearing." *Id.* At the second stage, like the first stage, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true for purposes of the State's motion to dismiss, and " '[t]he inquiry into whether a [postconviction] petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations.' " *People v. Domagala*, 2013 IL 113688, ¶ 35 (quoting *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)); *People v. Sanders*, 2016 IL 118123, ¶ 42.

¶ 50      At a third-stage evidentiary hearing, the petitioner must show by a preponderance of the evidence that there was a substantial violation of a

- 13 -

constitutional right during his trial proceedings. *People v. Coleman*, 2013 IL 113307, ¶ 92 (citing *People v. Stovall*, 47 Ill. 2d 42, 47 (1970)). At the third stage, unlike the first and second stages, the allegations are not taken as true, and instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *People v. Reed*, 2020 IL 124940, ¶ 51. Following a third-stage evidentiary hearing, a reviewing court will not reverse a trial court's findings regarding factfinding and credibility determinations unless the findings are manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. "Manifest error is 'clearly evident, plain, and indisputable.' " *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Id.*

¶ 51      In this case, petitioner's successive postconviction petition was denied after a third-stage evidentiary hearing. Petitioner initially argued in his opening brief that we could review the lower courts' rulings denying his actual innocence claim under a *de novo* standard of review because the lower courts failed to follow and apply this court's precedent in *Coleman*, 2013 IL 113307, and *Robinson*, leading to the lower courts committing legal errors. However, in his reply brief and at oral argument, he conceded that the parties agree that the standard of review following his third-stage evidentiary hearing is manifest error. We agree. Accordingly, we will review the circuit court's decision to deny petitioner's actual innocence claim following the third-stage evidentiary hearing for manifest error, as the circuit court was in the best position to observe the witnesses and make credibility determinations. See *Reed*, 2020 IL 124940, ¶¶ 51, 54; see also *People v. Fair*, 2024 IL 128373, ¶ 80 (manifest error "is based on 'the understanding that the postconviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a "position of advantage in a search for the truth" which "is infinitely superior to that of a tribunal where the sole guide is the printed record." ' " (quoting *Coleman*, 183 Ill. 2d at 384, quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957))).

¶ 52                          B. Actual Innocence Claim

¶ 53      Petitioner argues the lower courts erred in denying his successive postconviction petition following a third-stage evidentiary hearing because, when

- 14 -

viewing the old and new evidence objectively and collectively, as required, Dr. Franklin's expert testimony, the modern blood testing, and Millighan's exculpatory testimony together establish a claim of actual innocence.

¶ 54     To succeed on a claim of actual innocence, the petitioner must present evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive character it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)). "New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence." *Coleman*, 2013 IL 113307, ¶ 96. Evidence is considered material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative means the evidence adds to what was heard by the jury. *Coleman*, 2013 IL 113307, ¶ 96. Lastly, conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* Our court has emphasized that the conclusive character of the new evidence is the "most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. Accordingly, we may affirm the denial of the actual innocence claim based on the finding that the defendant failed to establish the conclusive character element. See *Sanders*, 2016 IL 118123, ¶ 47 (determining court did not need to address whether the petitioner's new evidence could have been discovered earlier in the exercise of due diligence and whether the evidence was material and not merely cumulative because it concluded that, even assuming these conditions were satisfied, the evidence was not of such conclusive character that it would probably change the result on retrial).

¶ 55     Ultimately, the circuit court will review the evidence presented at the evidentiary hearing to determine whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97. Such assessment involves credibility determinations that are uniquely

appropriate for trial judges to make, and we will not second-guess such credibility findings. See *Id.*

¶ 56    In this case, the circuit court "considered all the claims, arguments, filings, trial transcripts, the facts contained within the record, as well as the testimony [and] exhibits presented at the third-stage evidentiary hearing" before finding the evidence of actual innocence was not of such a conclusive character that it would probably change the results upon retrial.

¶ 57    In reaching its decision, the court made factfinding and credibility determinations as to the relevant evidence, such as where it found the affidavits and testimony at the evidentiary hearing of Millighan were "completely undermined by and totally contrary to his sworn trial testimony in which he denied any participation or involvement in the armed robbery at the liquor store and any knowledge of the shooter." The court noted Millighan was a convicted murderer, who had already completed his sentence at the time of his testimony. Moreover, the court found the trial testimony of both Awwad and Ghrayyib identifying petitioner as the shooter, with Hassan identifying petitioner as one of the people drinking in the store prior to the shooting, was "positive, consistent, clear and credible." The court stated the "only value of Millighan's testimony is that he finally confirms, after decades and decades of denials at his trial and [postconviction] filings, he finally confirms that the eyewitnesses at trial accurately described and identified Millighan's role in this murder and armed robbery."

¶ 58    The court recognized Dr. Franklin's expert eyewitness testimony but found "there was no evidence presented that the eyewitnesses were influenced by the police when they described the offenders immediately after the shooting nor when the eyewitnesses made their various identifications of the offenders." Instead, at the time of trial, "the eyewitnesses were questioned extensively on direct and cross-examination before the jury regarding their observations, descriptions, and identifications." Further, the court reviewed Lankford's expert testimony regarding the "possible" presence of blood on petitioner's shoes but determined it was not conclusive "in view of the overwhelming evidence of guilt presented in this case."

¶ 59    Initially, the appellate court agreed with petitioner that the circuit court conducted an improper analysis of the evidence at the third-stage evidentiary

hearing by failing to consider all of the evidence in the case collectively. 2025 IL App (1st) 240198-U, ¶ 14. Specifically, the appellate court stated,

> "In its ruling denying the defendant's petition, the court in this case considered each piece of new evidence, *i.e.*, the testimonies of Millighan, Dr. Franklin, and Lankford, and determined one-by-one that none of them was of such a conclusive character that it would probably produce a different result on retrial. The court did not consider all of the evidence together, as it should have. However, because the court found that Millighan was not a credible witness, which we will discuss next, a proper consideration of all the evidence would not change the outcome of the proceeding." *Id.*

¶ 60 The appellate court went on to review the circuit court's credibility determinations, reaching the same conclusion that Millighan's testimony lacked credibility and that, without that evidence, the testimony of Dr. Franklin regarding the alleged unreliability of the witness identifications and Lankford's testimony definitively excluding the presence of blood on petitioner's shoes were not enough to probably change the result on retrial. *Id.* ¶ 20. Specifically, the court stated

> "[t]hat evidence would certainly help the defendant's case to some degree and cast doubt on the State's evidence, but in the absence of conclusive evidence pointing to another perpetrator or excluding the defendant, the type of evidence that Millighan would have provided if he were credible, the addition of Dr. Franklin's and Lankford's testimony would not be enough to probably change the result." *Id.*

Ultimately, the appellate court found that petitioner's actual innocence claim was reliant on the credibility of Millighan and that petitioner failed to demonstrate that the circuit court's credibility determination was manifestly erroneous. *Id.* ¶ 21.

¶ 61 In reviewing the lower courts' judgments, we initially note that we disagree with the appellate court that the circuit court conducted an improper analysis of the evidence at the third-stage evidentiary hearing by failing to consider all of the evidence in the case collectively. While the circuit court went through the evidence presented at the evidentiary hearing one-by-one, it is apparent from the record that it considered all the evidence as a whole in determining that petitioner failed to state a claim of actual innocence. This is evident where the circuit court listed all the

- 17 -

evidence it reviewed and stated, "the evidence presented at this evidentiary hearing by the petitioner, when considered along with the trial evidence, failed to be of such a conclusive nature, it would probably change the result on retrial of petitioner." See *Robinson*, 2020 IL 123849, ¶ 48 (when a court reviews the evidence in an actual innocence claim, it must consider "whether the fact finder would reach a different result after considering the prior evidence along with the new evidence"); *Coleman*, 2013 IL 113307, ¶ 97 (the circuit court "in effect predicts what another jury would likely do, considering all the evidence, both new and old, together").

¶ 62    Accordingly, we reject the appellate court's finding that the circuit court did not collectively analyze the evidence. However, we ultimately agree with the appellate court's judgment that petitioner's actual innocence claim is reliant on the credibility of Millighan, and petitioner fails to demonstrate that the circuit court's credibility determination was manifestly erroneous.

¶ 63    At the third stage, the allegations are not taken as true, and instead, "the trial court acts as a factfinder, making credibility determinations and weighing the evidence." *Reed*, 2020 IL 124940, ¶ 51. Here, the circuit court at the evidentiary hearing properly weighed the evidence and made credibility determinations. Specifically, it found Millighan's testimony was not credible where his testimony at the evidentiary hearing was in direct conflict with his testimony at his trial. In contrast, the court went on to find the three eyewitnesses' testimony was "positive, consistent, clear and credible."

¶ 64    Based on the record, the circuit court's credibility determinations were not manifestly erroneous. We agree with the court that Millighan was not credible where his testimony at the evidentiary hearing not only directly contradicted his testimony at his own trial, in which he denied being involved in the robbery at the liquor store and any knowledge of the shooter, but his new testimony that he did not see petitioner on the night of the shooting was also contradicted by petitioner's counsel, who during opening statements before the evidentiary hearing conceded that, on the night of the shooting in April 1986, both Millighan and petitioner were in the liquor store around 11 p.m. See *People v. Rivera*, 166 Ill. 2d 279, 293 (1995) (where codefendant's credibility was clearly suspect where he was a convicted murderer and admitted perjurer and his testimony at the defendant's trial was inconsistent with his prior testimony at his own trial).

¶ 65        To the extent that petitioner argues that the circuit court made subjective credibility assessments, there is nothing in the record to support petitioner's contention. As stated above, the court explicitly stated it reviewed the evidence presented at the evidentiary hearing, in conjunction with the trial evidence in making its determinations, which included credibility findings.

¶ 66        In considering the circuit court's credibility findings along with the old and new evidence, together, as the lower courts did, we reach the same conclusion that petitioner has not met his burden of demonstrating that his new evidence would probably change the result on retrial.

¶ 67        As the appellate court acknowledged, if Millighan were credible and believable, it is likely that the result of a new trial would be different. However, the circuit court found Millighan's testimony lacked credibility, and because petitioner did not provide any other evidence pointing to another perpetrator or excluding the petitioner, all that remained to prove petitioner's actual innocence claim was Dr. Franklin's expert testimony, regarding the unreliability of the eyewitness identifications, and Lankford's expert testimony, clarifying the presumptiveness of the procedure used to test for blood on petitioner's shoes and the high risk of false positives. The circuit court explicitly looked at this evidence and found Dr. Franklin's and Lankford's expert testimony was not enough to probably change the result on retrial.

¶ 68        We agree with the lower courts that petitioner has failed to demonstrate that such evidence would probably change the result on retrial. The circuit court reviewed Dr. Franklin's expert eyewitness testimony but ultimately found the eyewitness testimony was consistent and thoroughly analyzed at trial.

¶ 69        Petitioner argues Dr. Franklin's testimony is similar to the expert testimony in *People v. Lerma*, 2016 IL 118496, ¶ 26, where the experts also spoke on the issues of memory and eyewitness identifications. In *Lerma*, this court explained that, where there is no physical evidence tying the defendant to the crime and the only evidence of guilt is the eyewitness identifications, "there is no question that this is the type of case for which expert eyewitness testimony is both relevant and appropriate." *Id.* Accordingly, this court affirmed the judgment of the appellate court, which reversed the trial court's ruling denying the admission of expert

eyewitness testimony at trial and remanded for a new trial to include such testimony. *Id.* ¶ 35.

¶ 70 We find *Lerma* distinguishable. While petitioner is correct that the experts in *Lerma* presented testimony similar to Dr. Franklin regarding eyewitness reliability, petitioner fails to acknowledge that the eyewitness testimony in *Lerma* was inconsistent, unlike the eyewitness testimony in this case. See *id.* ¶ 26. There were two eyewitnesses in *Lerma*, but only one was subject to adversarial testing and cross-examination at trial due to the fact one witness was deceased and his testimony was introduced at trial through others under the excited utterance exception to the hearsay rule. *Id.* As to the second eyewitness, her testimony was inconsistent in regard to how well she knew the defendant and how many times she had seen him before the shooting. *Id.* Here, on the other hand, as the circuit court pointed out, no evidence was presented that the eyewitnesses were influenced by the police when describing the offenders immediately after the shooting nor when the eyewitnesses made their various identifications of the offenders. Instead, at the time of trial, the eyewitnesses were questioned extensively on direct and cross-examination regarding their observations, descriptions, and identifications, and their testimony was "positive, consistent, clear and credible."

¶ 71 Specifically, Ghrayyib substantially corroborated Awwad's eyewitness testimony, and both men emphasized that they saw the shooter. Specifically, Awwad testified that the liquor store was well lit and petitioner walked right in front of him, "about four to five feet away." Awwad also recognized petitioner as a prior customer of the liquor store on other occasions, including earlier in the evening. Ghrayyib stated he saw the shooter clearly as he exited the store, carrying a black .38-caliber revolver, the same model identified as the weapon used to kill the victim. The eyewitnesses also testified that they identified petitioner as the shooter in a lineup where they all viewed the lineup individually. The description Awwad and Ghrayyib gave to police following the shooting also matched petitioner's description. Thus, not only does this case differ from *Lerma*, where the record here supports the circuit court's finding that the eyewitness testimony was consistent and credible, but *Lerma* did not involve a postconviction appeal and was reversed. See *id.* ¶ 20.

¶ 72     As the State points out, our case is more similar to *People v. Prante*, 2023 IL 127241, where the defendant attached an affidavit of Dr. Franklin, regarding the unreliability of the eyewitness identifications, to support his actual innocence claim on a motion for leave to file a successive postconviction petition. There, this court found Dr. Franklin's affidavit was cumulative of evidence introduced at trial and "impeachment evidence such as that offered in Dr. Franklin's affidavit typically is insufficient to justify postconviction relief." *Id.* ¶ 80 (citing *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) (holding that new testimony of nine inmates could, at best, be viewed as impeachment of a prosecution witness, which is an insufficient basis for granting a new trial)).

¶ 73     Like *Prante*, we agree that Dr. Franklin's testimony in this case is insufficient to justify postconviction relief and is better identified as impeachment evidence. Accordingly, the circuit court properly found Dr. Franklin's expert testimony was not conclusive, where the eyewitness testimony presented at trial was consistent and the eyewitnesses were "questioned extensively on direct and cross-examination before the jury regarding their observations, descriptions, and identifications."

¶ 74     In conjunction with Dr. Franklin's expert testimony, the circuit court also reviewed Lankford's expert testimony regarding the "possible" presence of blood on petitioner's shoes. It found that, not only did Lankford's affidavit and testimony corroborate Officer Roberts's trial testimony, but it was not conclusive "in view of the overwhelming evidence of guilt presented in this case."

¶ 75     We agree with the circuit court that Lankford's expert testimony corroborates Officer Roberts's trial testimony where Lankford recognized that Officer Roberts testified that the test he conducted on petitioner's shoes was only a preliminary test. Both Lankford and Officer Roberts acknowledged in their respective testimony that a preliminary test was performed on the shoes because "there simply wasn't enough left on the gym shoe to test any further." Moreover, Lankford testified that the substance on the shoe should have been referred to as "possibly blood," but Officer Roberts on cross-examination agreed that the preliminary test he conducted on the shoes could not determine whether the blood was from a human or animal. Thus, the circuit court properly determined that such evidence alone or in tandem with Dr. Franklin's testimony was not of such conclusive character that it would probably change the result on retrial.

¶ 76 Accordingly, because petitioner cannot establish that the evidence is of such a conclusive character that it would probably change the result on retrial, his claim of actual innocence fails. Therefore, we find the circuit court did not err when it denied petitioner's successive postconviction petition following the third-stage evidentiary hearing.

¶ 77 III. CONCLUSION

¶ 78 For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed the decision of the circuit court to deny petitioner's successive postconviction petition following a third-stage evidentiary hearing.

¶ 79 Judgments affirmed.

¶ 80 JUSTICES ROCHFORD and TAILOR took no part in the consideration or decision of this case.