2026 IL App (1st) 241398-U

SECOND DIVISION
April 14, 2026

No. 1-24-1398

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 16484 |
| | ) | |
| MARSHAWN CUNNINGHAM, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Third-stage dismissal of postconviction petition affirmed. Circuit court's finding that recantation testimony lacked credibility was not manifest error. Post-conviction counsel's failure to retain eyewitness identification expert was not unreasonable assistance.

¶ 2   Petitioner Marshawn Cunningham appeals from the third-stage dismissal of his post-conviction petition. His principal argument is that the circuit court committed manifest error in finding that the victim's recantation of his identification testimony—the sole factual basis for petitioner's claim of actual innocence—was not credible. Alternatively, petitioner argues that post-conviction counsel did not provide reasonable assistance at the hearing, because counsel failed to retain an expert on the (un)reliability of eyewitness identifications. We affirm.

¶ 3                                  BACKGROUND

¶ 4                          I. The shooting and trial evidence

¶ 5     Petitioner was convicted of aggravated battery with a firearm in connection with the shooting of Eddie Williams. At petitioner's bench trial, the State's case was based principally on the identification testimony of Williams and a second eyewitness, Anthony Ross.

¶ 6     The shooting took place shortly before 9:00 p.m. on August 1, 2012. Williams, Ross, and two other friends (Jimmy Simmons and Kewan Smith) were out walking near 66th and Sealy. It was starting to get dark, but not too dark to see clearly. Apart from one minor discrepancy, which the trial court found immaterial, Williams and Ross testified to the same account of the shooting that ensued.

¶ 7     In sum, they encountered three people on bicycles (either in the alley, according to Williams, or in the street, according to Ross). Williams and Ross were familiar with them from the neighborhood. One of them was Deshawn McKenny. And another was petitioner, whom Williams and Ross knew by his street name, "Money." Williams first met petitioner a couple months earlier, and they had no "problem" with each other—until now.

¶ 8     Williams had an Icee and some cookies. Petitioner twice asked Williams for some of his Icee, and Williams twice said no. An angry petitioner responded, "you a bitch." Petitioner's friends urged him to "chill out" as he bickered with Williams. Instead, petitioner escalated: he got off his bike and stepped up to Williams, who kept walking down the block with his friends.

¶ 9     Petitioner got back on his bike and followed, taunting Williams and threatening that "yo bitch ass won't be able to hoop again." (Williams played college basketball at the time.) Soon

enough, petitioner got off his bike again, came "face to face" to Williams, and pulled a small silver gun out of his pocket. Williams put his hands up and turned to walk away. As he turned, petitioner shot him once in the lower back. Williams and his friends scattered in all directions. Petitioner fled the scene on his bike. An ambulance took Williams to the hospital.

¶ 10    Williams testified that he first spoke to the police at the hospital, when Detective Bean came to interview him. Officer Zepeda testified that he spoke to Williams at the scene, and the parties stipulated that Officer Vargas would testify that he did the same. In any case, there is no dispute that Williams did not provide the police with any information about the shooting that night. Depending on the account, Williams either refused to answer questions or claimed that he didn't see—or saw but didn't know—who shot him. As Williams testified, he did not want to cooperate with the police, at least not at first, because he "wasn't a big fan of like telling on anybody or nothing like that."

¶ 11    Ross spoke to the police at the scene, but it is unclear from the record what he said. That evening, Officer Zepeda also spoke to Christopher Durr, another friend of Williams and Ross. According to Ross, Durr was not at the scene of the shooting. But after Durr was interviewed, "Money" became the prime suspect.

¶ 12    As it happened, petitioner was arrested within an hour of the shooting, about four blocks away, for unrelated reasons. He was riding a bike, and wearing red shoes and gray pants. While in custody, he was tested for gunshot residue. None was detected.

¶ 13    The next day, the police spoke to Williams and Ross again, this time at Williams's house. Williams still did not identify the shooter. And neither did Ross, as far as the record shows. But

Ross did describe the shooter and his clothing: a black male, 16 or 17 years old, about six feet tall, 170 to 180 pounds, with a medium complexion, and wearing a baseball cap, white shirt, and blue jeans. Defense counsel argued that McKenny and the third unidentified friend matched this description at least as well as petitioner. And as Williams acknowledged, McKenny knew that Williams played college basketball.

¶ 14    Twelve days after the shooting, on August 13, 2012, Williams's mother drove him and Ross to the police station, where they separately identified petitioner in a lineup.

¶ 15    The defense theory, in a nutshell, is that Durr identified petitioner based on neighborhood hearsay, and that Williams and Ross were eventually convinced to do the same—either by Durr himself or by the police (who were themselves convinced by Durr). Williams acknowledged that he spoke to Durr and the police numerous times in the days between the shooting and the lineup. But he denied that Durr had any role in convincing him to identify petitioner, and he said that the police simply exhorted him to tell the truth. As did his mother.

¶ 16    The trial court found that Williams and Ross were "strong" witnesses, and that any minor discrepancies in their accounts did not impugn their identifications of petitioner. The trial court found petitioner guilty of aggravated battery with a firearm (but not guilty of attempt murder) and sentenced him to 16 years in prison. We rejected his excessive-sentencing challenge on direct appeal. *People v. Cunningham*, 2017 IL App (1st) 141499-U.

¶ 17                              II. Post-conviction petition

¶ 18    Among other *pro se* claims no longer at issue, petitioner alleged his actual innocence. His *pro se* claim echoed trial counsel's theory: Williams and Ross, says petitioner, identified him as

the "result of Psychological Suggestion or linguistic manipulation" by the police officers who concluded, based on Durr's repetition of neighborhood hearsay, that petitioner was the shooter. The only affidavit attached to the *pro se* petition was petitioner's own.

¶ 19    The circuit court summarily dismissed the *pro se* petition, but it failed to do so within 90 days of docketing, so that dismissal was vacated and the petition was remanded for second-stage proceedings. Appointed counsel revised petitioner's claim of actual innocence, dropped the other *pro se* claims, and filed an amended petition along with a Rule 651(c) certificate.

¶ 20    Counsel also obtained an affidavit from Williams, dated August 24, 2022, in which Williams attests as follows: "The testimony I gave that Marshawn Cunningham shot me was not the truth. I had heard on the street that Marshawn was the shooter and that is why I testified the way I did at trial. Marshawn was not the person that shot me on August 1, 2012."

¶ 21    Williams was the only witness to testify at the evidentiary hearing. In short, he claimed that when petitioner asked for some of his "snacks," he "said no" and "just kept walking." And as he walked away, he "just heard a sound and then I was like shot in my lower back and then I just took off." In other words, Williams now claimed that he did not see who shot him.

¶ 22    Williams testified that he didn't remember what he told the police at the hospital. And it was the police who first gave him the idea that petitioner was the shooter when they came to his house the day after the shooting. Specifically, the detectives said that people in the neighborhood were pinning the shooting on petitioner. In response, Williams testified that he told the detectives, "that is not who shot me."

¶ 23    Williams recanted his lineup identification of petitioner. For one, Williams now claimed

that he did not go to the station of his own accord, or with his mother, as he claimed at trial. Rather, the detectives came back to his house, told him that he "had to come" with them, and drove him to the station. Williams could not recall whether he picked anyone out of the lineup, and the lineup report, documenting his identification of petitioner, did nothing to refresh his memory on this topic.

¶ 24    When the case went to trial, Williams was playing college basketball in Kansas. He did not want to testify, but he was served with a subpoena and told that he will "have a warrant out" if he did not appear. Williams claimed that he identified petitioner as the shooter—for the first time at trial—because "a lot of people throughout the neighborhood like really instilled in my mind, head and like mainly with the detective. So like that's who I believe had shot me at the time."

¶ 25    Although Williams did not recant his identification of petitioner under oath until his 2022 affidavit, he testified that he had "been trying to get the attention of like a mutual friend to like let [it] be known" that petitioner "was not the guy who shot me." Williams said as much in a notarized letter to this "mutual friend" in 2019. The letter was entered into evidence but is not available in the record. There is no dispute about what it says, or that it is not addressed to any identifiable person. When asked to identify the letter's recipient, Williams flatly refused: "I'm not stating his name." Williams later claimed that he only knew his friend's "street name," but he wouldn't reveal that, either.

¶ 26    For reasons we discuss below, the circuit court found Williams's recantation testimony "devoid of credibility" and thus dismissed the post-conviction petition.

¶ 27                                    ANALYSIS

¶ 28                              I. Actual innocence

¶ 29     Petitioner contends that he should be granted a new trial because he has established his claim of actual innocence, based on Williams's credible recantation of his prior identification testimony.

¶ 30     It was petitioner's burden, at a third-stage hearing, to establish his actual innocence by a preponderance of the evidence. *People v. McCoy*, 2026 IL 131565, ¶ 50. A claim of actual innocence must be supported by evidence that is new, material, non-cumulative, and "most important[ly]," conclusive. *Id.* ¶ 54 (quoting *People v. Robinson*, 2020 IL 123849, ¶ 47). The parties and the circuit court all agree, as do we, that Williams's recantation was new, material, and non-cumulative, so the only question is whether it was conclusive. If it was not, the claim may be denied on this basis alone. *Id.*

¶ 31     Evidence is conclusive if, "considered along with the trial evidence, [it] would probably lead to a different result" on re-trial. *Id.* The conclusive element of an actual-innocence claim frequently "involves credibility determinations that are uniquely appropriate for trial judges to make" after an evidentiary hearing. *People v. Coleman*, 2013 IL 1113307, ¶ 97. And here, the circuit court found that Williams's recantation was not conclusive because it was "devoid of credibility."

¶ 32     Because the circuit court was in the best position to weigh Williams's credibility, we review this determination deferentially for manifest error. *McCoy*, 2026 IL 131565, ¶ 51. An error is manifest if it is "clearly evident, plain, and indisputable." *Id.* (quoting *Coleman*, 2013 IL

1113307, ¶ 98).

¶ 33    We will turn to the topic of credibility findings shortly. But first, there is perhaps an even more fundamental reason why Williams's recantation testimony is not conclusive, one that the State does well to highlight. Williams purports to offer an affirmative statement, based on personal knowledge, that petitioner is innocent: petitioner, says Williams, "was not the guy who shot me." On its face, this is exactly the kind of evidence that a claim of actual innocence needs. But the pronouncement of innocence is misleading, or rather baseless. On Williams's own revised account of the shooting, he could not possibly know that petitioner *wasn't* the shooter.

¶ 34    At the hearing, Williams testified that he turned his back and walked away after denying petitioner's request to share his snacks. He no longer testified, as he did at trial, that he saw petitioner pull out a gun right before he turned around. As Williams now claimed, he was fully turned around when he "just heard a sound" and was shot in the back. The implication is clear: Williams did not *see* who shot him. So he did not *know* who shot him.

¶ 35    Given this account of the shooting and his own perceptions, Williams is in no position to affirmatively claim, on personal knowledge, that petitioner was *not* the shooter. The most he can do is withdraw his identification of petitioner and claim that he does not actually know who shot him. That would qualify as a recantation in the sense that Williams no longer positively identified petitioner as the shooter—it would reduce the number of positive identifications from two to one—but it would not cast any fresh doubt on the validity of *Ross's* identification. Thus, there is no reason why Williams's revised account of the shooting would lead a rational factfinder to reach a different conclusion at a retrial. It is not conclusive evidence.

¶ 36    The basic problem with Williams's testimony also speaks to his credibility. On the one hand, if his account of the shooting and his own perceptions were truthful and accurate, he has no basis for asserting, as he does, that petitioner "was not the guy who shot me." On the other hand, if Williams really does know that to be true, then his revised account of the shooting—that he had his back turned and doesn't know *who* shot him—was wrong about the most critical of points. Either way, what Williams offered was far from the kind of clear and credible testimony that warrants a new trial. What he offered was a self-contradictory jumble, one that falls apart at the seams with even the slightest pressure.

¶ 37    We could stop here. But the circuit court had its own reasons for finding that Williams was not credible, and those reasons bear at least brief discussion. Among them: Williams's demeanor on the stand; the "vague" and cursory nature of his hearing testimony, especially as compared to his clear and detailed trial testimony; his claimed "inability" to recall key details; his long delay in coming forward; and his "half-hearted effort to recant" when he eventually did.

¶ 38    Somewhat more specifically, the circuit court found it entirely believable that Williams was at first reluctant to cooperate with the police, for the unsurprising reasons he stated at trial, but was eventually persuaded to tell the truth. What the circuit court could *not* believe is that Williams didn't remember picking anyone out of the lineup, even after he was shown the lineup report, or identifying petitioner as the shooter at any time before he took the stand at trial. As for the letter Williams sent to the "mutual friend," his blunt refusal to identify the recipient made it hard to take the letter's assertions at face value. Lastly, the circuit court noted that Williams was

a reluctant witness, to say the least, who failed to appear for the hearing the first time around, and did so only after the court issued a rule to show cause.

¶ 39    Petitioner's arguments do not persuade us that any of the circuit court's conclusions were wrong, much less that its bottom-line assessment of Williams was manifestly wrong. Perhaps the best point, or set of related points, in petitioner's favor is this: Williams was a reluctant witness from the start, one who initially refused to cooperate with the police, and one who identified petitioner only after he was exposed to Durr's hearsay, either from Durr himself, or from the police who fixed on petitioner as the prime suspect after interviewing Durr.

¶ 40    But even this argument has a ready answer, one that Williams himself gave at trial. In a word, Williams was reluctant to snitch on anyone, but his own mother (perhaps among others) exhorted him to tell the truth. The circuit court found this familiar explanation believable. That was a reasonable credibility determination, especially when the alternative was to accept a years-late recantation from a witness who now claimed that he did not remember picking petitioner out of the lineup, that he told the police petitioner was *not* the shooter, and that the first time he ever said that petitioner shot him was when the State—not the defense, the State—called him to the stand as their star witness at trial. The circuit court was well within its rights to find that none of this was believable.

¶ 41    Petitioner would paint Williams as a regretful witness who felt a "sense of urgency or necessity" to recant his testimony and thus "repeatedly attempt[ed]" to do so. The basis for this claim is the letter Williams purportedly sent to a "mutual friend" in 2019. The circuit court did not give this letter much if any credence, given its dubious provenance and Williams's refusal to

identify the recipient when asked at the hearing. We would note, in a similar vein, that Williams never identified the source of the neighborhood hearsay he supposedly parroted at trial, and in particular, he conspicuously failed to confirm petitioner's theory that it was Durr. Williams's caginess and "lack of detail" on important topics like these, combined with his years-long delay in recanting his trial testimony, and his failure to appear at the hearing until compelled to do so, led the circuit court to find that Williams was not quite the candid and forthcoming witness that petitioner makes him out to be. We cannot say this finding was manifest error. The dismissal of the post-conviction petition is thus affirmed.

¶ 42                    II. Reasonable assistance of counsel

¶ 43    Petitioner further claims that post-conviction counsel's failure to retain an eyewitness identification expert to bolster his actual-innocence claim was unreasonable assistance. In the alternative, he requests a remand for a new evidentiary hearing.

¶ 44    To begin, petitioner does not dispute that counsel complied with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013), which enumerates the requirements for reasonable assistance at the second stage. Rather, petitioner argues that counsel provided unreasonable assistance at the third-stage hearing. Thus, Rule 651(c) no longer applies, and the applicable standard is "general reasonableness." *People v. Pabello*, 2019 IL App (2d) 170867, ¶ 29; also *People v. Knight*, 2020 IL App (1st) 170550, ¶ 39.

¶ 45    The statutory standard for reasonable assistance is decidedly lower than the constitutional standard for effective assistance of counsel. *People v. Smith*, 2022 IL 126940, ¶ 35. But with that caveat, our cases have otherwise modeled the "general reasonableness" inquiry on *Strickland*'s

- 11 -

deficiency-and-prejudice framework. *Pabello*, 2019 IL App (2d) 170867, ¶¶ 36-38; *People v. Watson*, 2022 IL App (5th) 190427, ¶¶ 48-50.

¶ 46    Petitioner argues that an eyewitness identification expert was "necessary to explain the science behind unreliable identifications" and, in so doing, explain why several of the factors bearing on the reliability of an identification weighed in favor of finding that Williams "and perhaps also Ross" misidentified petitioner as the shooter. The expert's testimony would thus "bolster" petitioner's actual-innocence claim, by supporting his allegation that Williams's "previous eyewitness identification was both incorrect and unreliable." And the claim needed bolstering of this kind because eyewitness recantations are often deemed insufficient at a third-stage hearing, which post-conviction counsel "should have *** known" "from basic research."

¶ 47    Among the various problems with this argument, the most fundamental and glaring is that the sort of expert testimony petitioner has in mind would not have helped him. The expert testimony appellate counsel advocates would have shown that Williams's identification was faulty, inaccurate, due to human frailties in perception and memory. But that wasn't Williams's testimony at the third-stage hearing; he said he was pressured or manipulated into saying something—that petitioner was the shooter—that he didn't actually know, because his back was turned when the shot was fired. Scientific testimony about the frailties of eyewitness testimony would have played no role in evaluating Williams's new testimony that he didn't see the shooter at all.

¶ 48    So we cannot imagine how we could deem postconviction counsel unreasonable for failing to present expert testimony that would have done nothing to advance the claim of a recanted identification.

¶ 49    Nor, to the extent petitioner's argument seems to suggest otherwise, was postconviction counsel required to raise a new theory or claim beyond those made in the initial postconviction petition. At the second stage, postconviction counsel is required to amend the claims contained in the initial petition but is under no obligation to add new claims beyond the initial petition. *People v. Davis*, 156 Ill. 2d 149, 163-64 (1993); *People v. Collins*, 2021 IL App (1st) 170597, ¶ 39; *People v. Rials*, 345 Ill. App. 3d 636, 641 (2003). The claim that Williams's identification was sincere but mistaken, based on faulty perception or memory, is a fundamentally different claim than the one in the initial petition—that Williams was pressured into identifying petitioner. And it was certainly not added to the petition at the second stage.

¶ 50    So by the third stage, postconviction counsel was obviously under no obligation to call a witness, expert or otherwise, in support of a claim that was not even raised in the petition at issue. And requiring counsel to raise this claim would clearly exceed the scope of the reasonable assistance to which petitioner was entitled.

¶ 51    Postconviction counsel did not provide unreasonable assistance in failing to call an expert on the frailties of eyewitness testimony.

¶ 52                                    CONCLUSION

¶ 53    The judgment of the circuit court is affirmed.

¶ 54    Affirmed.