2026 IL App (1st) 241395-U

FIRST DISTRICT,
SIXTH DIVISION
May 8, 2026

No. 1-24-1395

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 2634602 |
| | ) | |
| TERRY BARKER, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GAMRATH delivered the judgment of the court.
Justices Pucinski and Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm the circuit court's dismissal of a postconviction petition at the second stage where defendant failed to make a substantial showing that trial counsel was ineffective or that he was actually innocent.

¶ 2     On October 17, 2001, a group of men approached five individuals and robbed them at gunpoint before fleeing together in the same vehicle. Four victims testified and all identified the driver of the getaway car, defendant Terry Barker ("Barker"), as one of the robbers. Barker was found guilty of armed robbery and sentenced to 90 years' imprisonment. In his postconviction

petition, Barker asserts (1) his trial counsel was ineffective for failing to investigate and call a witness who would testify she "thought" Barker was behind her while running away from the robbers and (2) the recantation of one of the four victims was sufficient to make a substantial showing of actual innocence. We affirm the second-stage dismissal of Barker's petition.

¶ 3                                         I. BACKGROUND

¶ 4      Around 10:00 p.m. on October 17, 2001, Cardessa Smith ("Cardessa"), Daniel Smith ("Daniel"), Melvin Parker ("Melvin"), Shunte Heard ("Shunte"), and Zack Howard ("Zack") were standing outside of Daniel's home. Cardessa, Daniel, Melvin, and Shunte all testified consistently at trial.[1]

¶ 5      Cardessa testified they were sitting outside Daniel's home with Felicia Black ("Felicia") when a group of four or five men walked up from the east. Barker, wearing glasses and "a red hood and some jeans," approached Felicia and they walked three or four feet away. At this point Kenneth Barker ("Kenneth") displayed a "big gun" and yelled, "Break yourself," which meant "[r]obbery, give up whatever you have." Cardessa was told to drop her purse and wallet and forced into a hallway with Daniel, Shunte, Melvin, and Zack. Cardessa put her hands on the wall as the third man patted her down. She noted the fourth man was wearing a grey jump suit and held a handgun. Cardessa noticed Terry Barker standing outside close to the door but did not recall if he was holding a gun. At one point, Kenneth told Daniel, "I should kill your fat ass."

¶ 6      The men then fled east from the building in the same direction they had come, and Cardessa heard gunshots. Police officers in plain clothes arrived five to six minutes later and left after the group described what had happened. Later, Cardessa went to the police station where she spoke

---

[1] Because multiple interested parties have the same surname, we use their first names for clarity.

with detectives, identified her recovered purse, gave descriptions of the offenders, and identified Barker in a lineup as the man who spoke to Felicia and stood outside the building. Approximately two weeks later, on November 3, 2001, she identified Kenneth in another lineup as the man with the "big gun."

¶ 7    Shunte testified that while the group was outside Daniel's building, Barker walked up and asked to speak to Felicia. After Barker and Felicia walked away, Kenneth, Cornelius Halmon ("Halmon"), and another man approached. Kenneth, who was dating Felicia, was holding a sawed-off shotgun and wearing a red scarf. Halmon was wearing a grey jumpsuit holding a silver gun and the other man was wearing dark clothing. Kenneth told them to "break" themselves and another man told them to go into a hallway. Kenneth told Daniel, "I should shoot your bitch ass." Shunte saw Barker standing outside through a window in the door. Halmon held a gun on her as he fondled her and took her money.

¶ 8    Consistent with Cardessa's testimony, Shunte said the men fled east from the building in a "maroon bubble Chevy," and she heard four or five gunshots in the distance. Police officers in plainclothes arrived five minutes later and left after Shunte said they had been robbed and gave a description of their car. A second group of police officers arrived, and Shunte provided descriptions of the men. Later Shunte identified Barker and Halmon in separate lineups at a police station, and on November 3, 2001, she identified Kenneth in another lineup.

¶ 9    Daniel testified he saw Barker "walking up the block" with two other men while he was standing outside his building with the group. Barker approached and "said something to Felicia" and the "next thing you know, Kenneth run [*sic*] out of the alley." Kenneth, Felicia's boyfriend, was wearing a bandana around his face and holding a shotgun and told them all to "break"

themselves. At this point, the other men pulled out their guns and Barker told Kenneth and the others to take the group into the hallway. In the hallway, Kenneth pointed his gun at Daniel, said "I should kill your bitch ass," and went through his pockets. Kenneth took his phone, keys, and money. Barker stayed outside the front door.

¶ 10    As the men left, they "fired off a couple of shots" to make sure they were not followed. Daniel hid for a minute, then left the hallway and saw the men leaving the alley in an "orange bubble Caprice Chevy" driven by Barker. Police officers arrived and "[t]he girls and everybody just started yelling they got robbed and they described the car" and the police left. Another group of police officers arrived, and Daniel gave them another description of the offenders' car and clothing. Daniel later identified Barker, Halmon, and Kenneth in separate lineups as the robbers.

¶ 11    Melvin testified that Felicia, Kenneth's girlfriend, was standing near his group when he saw "some guys walking from a block over" towards them. Barker approached Felicia, Kenneth "went in the alley," and two other men stayed near Melvin's group. After Barker said something to Felicia, she walked off while Barker turned back towards the group. At this point, Kenneth exited the alley with a shotgun and said "break you all selves" while the other men pulled out guns. Barker ordered the men to take the group into the hallway inside the building while Barker stood outside. The men left traveling east and Melvin heard gunshots. He saw the men get into a burgundy "bubble" Caprice in the alley. Melvin recognized the car as one he had seen Barker and Kenneth traveling in before the robbery. Like the other victims, Melvin identified Barker, Halmon, and Kenneth in lineups.

¶ 12    Chicago Police Officer Brian Keenan ("Keenan") testified that he and his partner responded to a report of shots fired and armed robbery around 10:07 p.m. and saw five people

flagging them down. Keenan received a physical and clothing description of the offenders, information about the guns they were carrying, and a description of the car in which they fled. A few minutes later, Keenan learned that other officers were behind a vehicle matching a description of the getaway car.

¶ 13    Officer Sheamus Fergus ("Fergus") testified he received a call on the radio that gunshots had been fired from a maroon bubble-style Chevy Caprice while fleeing from the scene of an armed robbery. Ten minutes later, Fergus saw a car matching the description approximately 14 blocks away from the robbery scene. He saw three individuals in the back seat and attempted to curb the car. As the car came to a rolling stop, Kenneth exited the rear passenger's side door and fled. Holman also exited the car, looked at Fergus, pulled out a "large chrome revolver," pointed it at Fergus's car, then fled. Fergus ran after the men, eventually arresting Holman. Kenneth was arrested a couple weeks later at Felicia's house.

¶ 14    Fergus's partner, Officer George Kuzmanovski ("Kuzmanovski"), approached the car after Kenneth and Holman fled. Kuzmanovski ordered the driver, Barker, to shut off the vehicle and put his hands in the air. Barker, who was wearing a red hooded sweatshirt, drove off, and Kuzmanovski put out a description over the radio. Kuzmanovski saw Barker wearing the same sweatshirt when he was arrested later that evening. Kuzmanovski recovered a chrome revolver loaded with five spent casings and one live round, Shunte's cell phone, and a bag of marijuana on the sidewalk near where Holman had pulled out the gun.

¶ 15    Officer Kurt Daichendt ("Daichendt") testified he heard a call about the maroon Chevy Caprice and saw a vehicle matching the description in an alleyway between LeClaire and Leamington. The car had its driver's door open and Daichendt saw Barker leaping over a fence

before he was arrested by Officer Joseph Ferraro ("Ferraro") and his partner. Back at the car, Daichendt saw a sawed-off shotgun on the back seat, a black and white snakeskin pattern purse on the front seat, and multiple cell phones in the vehicle. Daichendt found two sets of keys lying on the pavement in the alley near the car.

¶ 16    The jury found Barker guilty of five counts of armed robbery and the trial court sentenced Barker to a total of 90 years' imprisonment. In 2006, we rejected Barker's claim that his sentence was "grossly disparate" to Kenneth's sentence but granted his request to correct his mittimus to reflect time spent in pre-sentence custody. *People v. Barker*, No. 1-04-1558 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 17    On November 29, 2006, Barker filed a *pro se* postconviction petition, arguing that the trial court erred during *voir dire* and while instructing the jury, the State failed to prove him guilty of the armed robbery and he was denied the effective assistance of appellate counsel for failing to raise these issues on direct appeal. The trial court docketed the petition for further proceedings and appointed Assistant Public Defender Michaela Kalisiak ("APD Kalisiak") to represent both Barker and Kenneth on postconviction matters.

¶ 18    On June 26, 2018, APD Kalisiak filed an amended postconviction petition asserting ineffective assistance of trial counsel for failing to investigate Felicia as a witness as well as a certificate pursuant to Illinois Supreme Court Rule 651(c). The amended petition included affidavits from Felicia and Barker, and a note from Barker's trial counsel that indicated that an APD investigator went to Felicia's residence in January 2004, but "Felicia would not even open the door to speak."

¶ 19    In Felicia's affidavit, dated June 2, 2011, she stated that on October 17, 2001, she was on West End Avenue and saw Daniel standing outside with several other people. Barker walked up West End with Halmon and "Scan" walking behind. Felicia saw "another man" in the gangway wearing a scarf over his face and dark hoodie. She could not see who it was but knew it was not Kenneth because she had been "romantically involved" with him. Barker asked her to step away to talk and after a conversation she saw "three or four other men" walk up to the group. The man from the gangway pulled out a shotgun and yelled "Bitch, brace yourselves." Felicia ran away to her house and "thought" Barker was right behind her. She averred that she recounted this story to police when interviewed on October 19, 2001, would have told Barker's attorneys the same if she had been contacted, and would have testified at trial.

¶ 20    In Barker's April 5, 2018, affidavit, he stated that he asked his counsel to speak to Felicia as a potential witness on multiple occasions. His counsel told him "she had made the decision" not to call Felicia as a witness because her testimony was "not needed."

¶ 21    On December 10, 2019, APD Kalisiak filed a motion to withdraw from representing Barker due to a conflict of interest. According to the motion, Daniel recanted his identification of Barker as one of the robbers but did not recant his identification of Kenneth. Attached to the motion was Daniel's November 14, 2019, affidavit in which he averred that he identified Barker, Kenneth, and Halmon in lineups and at trial "because the police had told [him] that these were the people who had robbed [him]." Daniel stated he was "never certain" that Barker was one of the robbers "because he did not match the size and shape" of the robber. In the ensuing years, Daniel was "bothered" by his conscience because he "knew" Barker was not one of the robbers and contacted Barker's cousin, Freddy Halmon, to tell him he wanted to recant his identification.

¶ 22    On July 17, 2020, APD Kalisiak filed a supplemental amended post-conviction petition, which raised a claim of actual innocence based on Daniel Smith's affidavit. On February 28, 2022, the State filed a motion to dismiss Barker's amended petition and supplement.

¶ 23    The trial court granted the State's motion to dismiss on June 27, 2024. It found Barker failed to prove ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984), as his counsel did attempt an investigation, and Barker could not show prejudice given Melvin's consistent identification of him as the getaway car driver. The court also rejected Barker's actual innocence claim, finding Daniel's affidavit inconclusive because Melvin still identified Barker, who was found driving the car with the victims' stolen items while wearing the same clothes seen during the robbery.

¶ 24                                      II. ANALYSIS

¶ 25    On appeal, Barker argues that he made a substantial showing of ineffective assistance for failing to investigate and call Felicia Black, and a substantial showing of actual innocence based on Daniel Smith's recantation, entitling him to a third-stage evidentiary hearing. We disagree.

¶ 26    The Post-Conviction Hearing Act (Act) provides a three-stage framework for incarcerated individuals to collaterally attack their convictions by establishing the substantial denial of a constitutional right during trial or sentencing. 725 ILCS 5/122-1(a)(1) (West 2018); *People v. Schlosser*, 2012 IL App (1st) 092523, ¶ 15. If the petition is not dismissed at the first stage, it moves to the second where the defendant must make a "substantial showing of a constitutional violation." *Id.* This "substantial showing" standard is higher than the filing standard at the first stage and the "colorable claim" successive petition standard. *People v. Robinson*, 2020 IL 123849, ¶ 58. At the second stage, like the first stage, all well-pleaded facts that are not positively rebutted

by the original trial record are to be taken as true for purposes of the State's motion to dismiss, and " 'the inquiry into whether a [postconviction] petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations.' " *People v. McCoy*, 2026 IL 131565, ¶ 49 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 35). We review *de novo* the dismissal of a postconviction petition at the second stage. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 27                                    A. Ineffective Assistance of Counsel

¶ 28    A defendant is guaranteed the right to the effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. art. I, § 8. A defendant is "entitled to reasonable, not perfect, representation." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). Accordingly, to prevail on a claim of ineffective assistance, "a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36, (citing *Strickland*, 466 U.S. at 687). To show deficient performance, a defendant must overcome the "strong presumption" that counsel's decisions were the product of "sound trial strategy" and demonstrate that counsel's performance fell below an objective standard of reasonableness. *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 29    The decision to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant. *People v. Peterson*, 2017 IL 120331, ¶ 80. Such decisions do not ordinarily support an ineffective assistance of counsel claim. *Id.* To demonstrate prejudice, a defendant must show "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694).

¶ 30    Barker argues that his petition set forth sufficient allegations to meet both *Strickland* prongs. With respect to deficient performance, Barker maintains that trial counsel failed to investigate Felicia as a witness and present her account of the offense at trial. Barker argues he was prejudiced by counsel's performance because Felicia's testimony "would have supported the defense theory that while [he] was in the vicinity of the robbery when it occurred, he did not take part in it."

¶ 31    We find Barker has failed to make a substantial showing of ineffective assistance. First, evidence included with Barker's amended postconviction petition reflected that trial counsel attempted to contact Felicia through an investigator in 2004 but "Felicia would not even open the door to speak." Second, Felicia's purported testimony that she "thought" Barker was behind her as she ran away was entirely speculative and rebutted by the record. There is no reasonable probability the result would have been different with her testimony.

¶ 32    Barker claims his counsel inadequately investigated Felicia as a witness, alleging the investigator failed to properly identify itself or that Felicia was not home during the attempt. This is speculative. Evidence from Barker's own petition shows that when the investigator visited, Felicia refused to open the door to speak. There is no indication she was absent or unaware of the attempt. Thus, we do not find counsel's actions in sending an investigator unreasonable.

¶ 33    Barker reliance on *People v. Truly*, 230 Ill. App. 3d 948 (1992), is misplaced. In *Truly*, the defendant was convicted of robbery and argued on appeal that trial counsel was ineffective for failing to investigate, prepare, and present his alibi. *Id.* at 949. This court found defense counsel was "derelict in his duties" because he never made a reasonable attempt to locate or subpoena four potential witnesses, whose names and addresses were provided by the defendant. *Id.* at 950-55.

Here, by contrast, defense counsel attempted to contact Felicia, sent an investigator to her residence, and reasonably concluded, after she refused to engage, that her testimony was unnecessary and potentially harmful. This was a strategic decision, not ineffective assistance.

¶ 34    Barker argues that counsel could not have made a strategic decision not to call Felicia because counsel "had no idea" whether her testimony would be helpful. But the testimony of other witnesses established, as Felicia acknowledged in her affidavit, that she was with the victims when Barker approached, separated her from the group, and that Kenneth, with whom she had been romantically involved, then emerged from the alley and began the robbery. Her usefulness as a witness ended there, as she left before the victims were taken into the building. Given Melvin's testimony that Barker directed the others to bring the victims inside, the victims' consistent testimony placing Barker at the doorway during the robbery, and Barker's arrest while driving the getaway car, counsel reasonably concluded that Felicia's testimony would add little and could be damaging. She also would have been subject to cross-examination about her relationship with Kenneth and potential knowledge of the robbery plan.

¶ 35    For this reason, Barker has not demonstrated he was prejudiced by counsel's performance. Given the substantial evidence of Barker's involvement in the robbery presented at trial, there is no reasonable probability that Felicia's speculative testimony she "thought" Barker was running behind her would have changed the result at trial. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 36                                B. Actual Innocence

¶ 37    To succeed on an actual innocence claim, Barker was required to establish that the evidence offered was: (1) newly discovered; (2) material and not merely cumulative; and (3) of such

conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶ 24.

¶ 38    Our supreme court has emphasized that the conclusive character of the new evidence is the "most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. Conclusive means that the new evidence, when considered along with the trial evidence, would probably lead to a different result. *People v. Coleman*, 2013 IL 113307, ¶ 96. In deciding whether evidence is conclusive, the question is "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. Therefore, probability, not certainty, "is the key in considering whether the fact finder would reach a different result" after considering both the prior and new evidence. *Id.*

¶ 39    In this case, Barker's actual-innocence claim rests solely on Daniel's affidavit. Daniel asserted that he identified Barker in the lineup and at trial only because police told him Barker was one of the robbers, and he now believes Barker was not involved because he did not "match the size and shape" of the offender. Daniel offered no explanation for recanting after 18 years other than a "bothered" conscience.

¶ 40    Even accepting Daniel's assertions as true at the second stage, they do not cast the trial evidence in a different light or undermine confidence in the verdict. At trial, Daniel, like the other three victims, explicitly testified that no one told him whom to identify in the lineup. He also provided police with a description of the getaway car and the robbers' clothing before he was ever asked to make an identification. Officer Kuzmanovski saw Barker driving the getaway car while wearing the red hoodie Daniel had described, and Barker was arrested in that same hoodie.

Proceeds and firearms from the robbery were recovered in and around the vehicle. Daniel has never recanted the descriptions he gave to police or claimed that officers told him what to say before his identifications.

¶ 41    Additional evidence of guilt included consistent identifications from the three other victims that Barker was the man who approached Felicia immediately before Kenneth sprang from the alley and initiated the robbery. Melvin testified that when Felicia walked away, Barker turned back toward the group holding his own gun and ordered the other men to take the victims into the building, which they did. All three victims also testified that they saw Barker standing outside the building through the window in the door while the robbery was underway.

¶ 42    Barker argues that, if credited, Daniel's new statements could lead jurors to conclude that Barker was merely outside investigating the commotion. This argument ignores the remaining evidence of guilt, including Melvin's testimony that Barker directed the others to bring the victims inside and the fact that Barker drove the getaway car from which Kenneth and Halmon fled and in which guns and proceeds from the robbery were recovered. Daniel's affidavit falls far short of conclusive evidence of innocence.

¶ 43    The circuit court therefore did not err in dismissing Barker's petition. He failed to make a substantial showing of either ineffective assistance or actual innocence and is not entitled to a third-stage evidentiary hearing.

¶ 44    Affirmed.