2026 IL App (1st) 232391-U

SECOND DIVISION
June 16, 2026

No. 1-23-2391

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07CR21901 |
| | ) | |
| OMAR DIXON, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's denial of defendant's postconviction petition after an evidentiary hearing was not manifestly erroneous because defendant's new evidence of actual innocence failed to undermine the court's confidence in the judgment of guilt.

¶ 2    Defendant Omar Dixon appeals from the trial court's denial of postconviction relief following a third stage evidentiary hearing. Specifically, he argues that the testimony from three new witnesses corroborated his claim of self-defense, and the trial court's finding to the contrary was manifestly erroneous.

¶ 3    The shooting at issue occurred around 5 a.m. on October 7, 2007, outside The Black

Room, a social club located near East 61st Street and South Vernon Avenue in Chicago. Following a bench trial, defendant was found guilty of aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated unlawful use of a weapon by a felon. The trial court subsequently sentenced defendant respectively to concurrent terms of 40, 15, and 7 years in prison. We outline the evidence presented at defendant's trial to the extent necessary to resolve the issue on appeal. A full discussion of the evidence presented at defendant's trial was set forth in the direct appeal. *People v. Dixon*, 2012 IL App (1st) 110815-U.

¶ 4    Jason Jones testified that he spent the evening drinking at defendant's house. When defendant left to go to the Black Room, Jones stayed at defendant's home and slept. Jones woke up later when defendant arrived home in the early morning hours. He saw that defendant was bleeding from "a gash on top of his head" where it looked like "[s]omebody had hit [defendant] in the head with a bottle, [or] a gun." Defendant drove the two of them to the Black Room in defendant's Cadillac. Jones noticed that defendant had a black handgun on his lap. Defendant parked the car around the corner from the club and exited, but Jones stayed in the car and did not see what direction defendant went. Jones soon heard a "bunch of gunshots" from the direction of the club. He was unable to see who fired the gun. Defendant returned to the car with the gun, which he placed between the armrest and Jones's seat before driving away. Not long after, the police curbed the car and defendant told Jones to run. Jones fled but was apprehended almost immediately. Jones was impeached with pending charges for misdemeanor possession of cannabis, contempt of court for his failure to appear in this case, felony unlawful use of a weapon, felony resisting a peace officer; and a Texas conviction for possession of cannabis.

¶ 5    John Fuller testified that he was an investor in the Black Room and served as the "sergeant at arms," which was a position similar to a bouncer. On October 7, 2007, Fuller was

present at the club around closing time at 5 a.m. At that time, he was walking some women to their cars when he saw defendant at the corner of 61st and Vernon. As Fuller approached defendant, he heard defendant "mumbling and mad about something." When Fuller asked defendant what the problem was, defendant told him to "step back, get the f*** back by him." Robert Gladney, another witness who testified, was approaching Fuller when Fuller noticed defendant had a black automatic pistol. Defendant raised the gun and fired at Fuller, striking him below the knee of his right leg. Fuller heard two gunshots. He fell and crawled behind a car to get out of the way. Everyone scattered after the gunshots and Fuller did not see where defendant went.

¶ 6    Fuller denied having a gun that night, and he did not fight or threaten defendant. He did not see anyone else in possession of a gun. After being shot, Fuller was taken to the hospital by ambulance and suffered permanent nerve damage to his leg. He subsequently identified defendant in a police lineup and provided a sworn statement to the police. He was impeached with prior charges for possession of a controlled substance, possession of cannabis, and a business license violation. All of these charges were later dismissed.

¶ 7    Gladney testified that he was sitting outside the Black Room around 5 a.m. on October 7, 2007, when he heard a "tussle" inside the club. He entered the club and saw security escorting defendant out of the club. Defendant was bleeding from his head. Gladney testified that Fuller was not involved in that incident and he had not seen Fuller at that point in the night. Once outside, Gladney saw defendant walk down the street and then disappear, but defendant returned 10 to 15 minutes later shouting at the back door of the club. Gladney saw Fuller approach and speak to defendant. As Gladney walked toward the men, he saw a gun in defendant's hand and heard defendant say, "not to walk up on him." Gladney did not see a weapon in Fuller's hands.

3

Fuller then pushed Gladney out of the way and Gladney began to run away. Gladney heard two gunshots, ran into the club, and told everyone about the shooting. When Gladney went back outside, Fuller was lying on the ground. Gladney was impeached with his prior convictions for possession of a fraudulent identification card and domestic battery, as well as a stricken charge of obstructing an officer, and a pending charge of unlawful use of a weapon by a felon.

¶ 8 Demitrius Champs testified that he arrived at the Black Room between 3 and 4 a.m. on October 7, 2007. At around 5 a.m., Champs saw Fuller on the corner of 61st and Vernon talking to an unknown individual. Champs then heard three to four gunshots and ducked behind a car. When the shooting stopped, he went to the corner and saw that Fuller had been shot in the leg and was on the ground. He saw a "husky" man run down the street and enter the driver's side of a Cadillac. Champs ran back and got on his motorcycle to follow the Cadillac. He flagged down a police car driving down the street and told them about the shooting. When they curbed the Cadillac, the front passenger exited the car and ran. This man had a different build than the person Champs had seen running after the shooting, this man was "shorter and not as husky." Champs identified defendant in court as the driver of the Cadillac.

¶ 9 Kenyada Fort testified that she was the secretary of the Black Room, Fuller was the president, and defendant was a club member. On October 7, 2007, she arrived at the club around midnight and defendant arrived between 3 and 4 a.m. with a couple of people. She did not see him again until around 5 a.m. when she saw Fuller and defendant speaking at the corner as people were leaving the club. The conversation lasted about 30 to 45 seconds. Fort saw Fuller push Gladney and Fort noticed defendant raising and then firing a gun. She heard several shots and ran back into the club after the first shot. When she went back outside, Fuller was lying on the ground after being shot in the leg. She did not see a gun in Fuller's hand. Fort was unaware

4

of an altercation involving defendant and she did not notice if defendant's head was bleeding. Fort was impeached with a prior arrest for "possession of a controlled substance and cannabis" that was later dismissed.

¶ 10    Officer Gregory Wood testified that shortly after 5 a.m. on October 7, 2007, he received a flash message regarding an incident involving a gold Cadillac. He spotted and then curbed the vehicle. He observed four individuals in the car and the front passenger fled the scene but was apprehended and returned to the scene. Officer Wood ordered the driver, identified in court as defendant, out of the car and placed him under arrest. He noticed that defendant was bleeding from a wound to his forehead. Officer Priscilla Hernandez testified that she was also present at the scene and saw a black gun on top of the console between the driver and passenger seats. She recovered the firearm, which was a .45-caliber weapon in the slide lock position with no bullets remaining in the chamber.

¶ 11    The parties stipulated that a gunshot residue (GSR) test was performed on defendant and the results indicated that defendant "discharged a firearm, contacted a [GSR] related item, or had the right hand in the environment of a discharged firearm." During processing of the shooting scene, six fired .45-caliber cartridge cases, one .9mm shell case, two live .9mm rounds, a fired bullet of an unknown caliber, and a fragment from a fired bullet were recovered. The six fired cartridge cases were recovered in close proximity to each other. The parties stipulated that all six of the recovered .45-caliber cartridge cases, the fired bullet, and the bullet fragment were fired from the firearm recovered from defendant's car.

¶ 12    Elzie Johnson, who testified for the defense, arrived at the Black Room on October 7, 2007, around 2 a.m. According to Johnson, defendant was involved in an altercation with a few security men at the club between 4:30 and 5 a.m. Johnson, though, was "highly intoxicated" at

this time. One of the men involved in the altercation was "brandishing something real shiny. Kind of like steel. Probably resembled a handgun." Johnson saw defendant being repeatedly struck on the head with this object. Defendant was bleeding from the head and then dragged by these men out of the club. Johnson left the club shortly thereafter and was not present at the time of the shooting.

¶ 13    Andrea Killingsworth also testified for the defense. She was outside the Black Room at around 5 a.m. on October 7, 2007, when she saw "four or five guys jumping on" defendant, who was bleeding from his head. Killingsworth saw that one of the men had a gun and defendant was reaching for the gun. As Killingsworth was walking to her car, she heard several gunshots from the same area where the altercation had been. She stated that it sounded like different guns had been fired, but she did not see the shooting. Killingsworth got into her car and drove away without calling police. She knew defendant socially and visited him in jail but did not know why he was in jail or that it was related to the incident from October 2007. She was impeached with a prior conviction for possession of a controlled substance.

¶ 14    Defendant testified that on October 7, 2007, he drove to the Black Room in a gold Cadillac with Jones and two women. He arrived there about 3:30 a.m. and parked down the street from the club while Jones remained in the car because he was drunk. About an hour and a half after entering the club, defendant was hit in the face by one of the security men without provocation. Defendant hit him back and was attacked by three more security men, one of whom was Gladney. One man had a silver gun and another man had a black gun which they were using to hit him on the head. Defendant ran out of the club, but was stopped by Fuller, who held him until the security men arrived and continued to assault him. At this point, defendant took Fuller's gun from him. Gladney then fired a silver gun at defendant and defendant returned fire toward

Gladney.

¶ 15    Defendant ran down the street and continued to fire the gun at Gladney until he was out of bullets. He entered the driver's seat of the Cadillac and drove away. Defendant did not think to drop the gun as he ran away. The parties stipulated that defendant had a prior conviction for unlawful use of a weapon by a felon.

¶ 16    Following arguments, the trial court found defendant guilty of aggravated battery with a firearm, aggravated discharge of a firearm, and aggravated unlawful use of a weapon by a felon. The court found defendant not guilty of attempted first degree murder. In its findings, the court specifically observed that the testimony from defendant, as well as defense witnesses Johnson and Killingsworth, "strain[ed] the bounds of credibility" and did not "make sense in light of the physical evidence and in light of the totality of the circumstances in the case." The court further found Jones's testimony to be "most compelling and the most believable."

¶ 17    On direct appeal, defendant argued: (1) the evidence was insufficient to prove him guilty of aggravated battery with a firearm and aggravated discharge of a firearm, and that judgment should be entered on the lesser-included offense of reckless discharge of a firearm; and (2) his 40-year extended-term sentence was excessive. This court affirmed defendant's convictions and sentence. *Dixon*, 2012 IL App (1st) 110815-U, ¶¶ 30, 37.

¶ 18    In October 2019, defendant, represented by counsel, filed his postconviction petition and alleged his actual innocence based on newly discovered evidence. Defendant supported his claim with affidavits from three individuals: April Sanders, Bryant Madison, and Marshon Kuntu. All three individuals stated in their respective affidavits that they had been at the Black Room in the early morning hours of October 7, 2007, when they saw defendant in an altercation with three men, two of whom were armed with a firearm. They each saw defendant take a gun from one of

the men. One of the armed men fired in defendant's direction before defendant fired back in that man's direction. Defendant then ran from the scene.

¶ 19    The trial court advanced the petition to the second stage in December 2019 and the State moved to dismiss defendant's petition in August 2020. The postconviction court denied the State's motion in December 2022 and advanced the petition for a third stage evidentiary hearing.

¶ 20    In August 2023, the postconviction court conducted the evidentiary hearing. Defendant presented the testimony from the three affiants.

¶ 21    April Sanders testified that she arrived at the Black Room between 4 and 5 a.m. on October 7, 2007. She stayed approximately 30 to 40 minutes. She left when a fight broke out between a young man and three security guards. She identified defendant in court as the man involved in the altercation. She said she knew of defendant, but she did not personally know him. She made her way to the exit and walked to her car. As she got to her car, she saw defendant running from the club with security chasing him. The security guards caught up to defendant and "hit him over the head with something that appeared to be a gun." Sanders was across the street from this altercation.

¶ 22    Sanders could not say for certain where the first shots came from. When the gunshots started, she ducked down behind her car. After she stood up, she heard defendant "hollering" to get back. She saw that both defendant and one of the security guards had guns. The security guard fired a shot and then defendant fired another shot before running away. She estimated that more than 20 people were outside at that time. Sanders was not contacted after the shooting.

¶ 23    Later, she saw a Facebook post about defendant's conviction. Defendant's brother reached out to her and asked her to "write a statement" about what she saw happen at the club. Her affidavit was prepared in 2012 but she did not have it notarized until 2019.

¶ 24    Sanders was questioned about discrepancies between her testimony and her statements in her affidavit. In her affidavit, Sanders stated that she saw three men assaulting defendant, but in her testimony, she recounted that one man assaulted defendant before a second joined in. Sanders also stated in her affidavit that she saw two people hit defendant over the head and that two of the security guards had big black guns, but she testified that "I don't know if I said two people, but one of the guys hit him over the head with a gun or an object that appeared to be a gun. I can't say it was a gun for sure." In her testimony, Sanders said she heard 4 to 6 shots but in her affidavit, she stated she heard 6 or 7 gunshots. Sanders testified that she did not see who fired the first shot, but she said in her affidavit that she saw defendant shoot back at the person who shot at him. Sanders admitted she said in her affidavit that she saw defendant bleeding, but she testified she could not see him bleeding from her position across the street.

¶ 25    Bryant Madison testified that he arrived at the Black Room at around 3 a.m. on October 7, 2007. He later saw two guys arguing back and forth, but he could not tell who was arguing in a group of three or four men. He estimated the argument lasted 30 to 40 minutes. After the argument, two of the men started fighting and Madison decided to leave the club. As he got to his car, he saw the individuals from the club run past him. He did not recognize anyone but said they were the individuals fighting inside the club. Madison testified that there were two or three individuals and they were "brandishing guns." These individuals went back toward the club and there was "another confrontation that ensued down the street in front of the club." Madison saw a bunch of people and "then shots went off." He ducked, "jumped" into the car, and left the scene.

¶ 26    Madison identified defendant as one of the men being attacked by two people inside the club, but he did not know defendant's name. Madison stated that he could not see much. All he saw was three individuals move toward defendant and defendant trying to defend himself. Then

Madison heard gunshots. He did not see defendant with a gun, nor did he see who fired a gun or what happened after the gunshots.

¶ 27     Madison saw a post on Facebook about the shooting two or three days after it occurred and he commented on the post that he was present at the scene. A person then contacted Madison and asked if he would be willing to give a statement. Madison wrote his affidavit in 2017. He admitted he wrote in his affidavit that he saw defendant in possession of a gun, but he did not actually see defendant with a gun.

¶ 28     Marshon Kuntu testified that he was at the Black Room in the first week of October in 2007 and had arrived between 3 and 3:30 a.m. He stayed about 30 to 40 minutes and left "some time before five." He left because there was "a commotion" inside the club. He described the commotion as a crowd of people "tussling." When asked if he recognized anyone in the commotion, Kuntu said he recognized "the person now." The commotion did not involve anyone he was concerned with. He then identified defendant and said he did not know defendant before that night. When the "tussle" started, Kuntu decided to leave and went to his car.

¶ 29     When the tussle came outside, he saw defendant was involved and he did not recognize any of the others involved. Kuntu said defendant was trying to get out of the tussle. Kuntu was not paying attention but he did see one of the men hit defendant in the head. Two of the men involved had "metal objects." A gunshot went off and then defendant started running. Kuntu heard five to seven more shots. He did not know who fired the first shot. As defendant ran away, Kuntu saw gunshots going both toward defendant and toward the individuals involved in the altercation. When asked if he saw defendant with a gun, Kuntu stated that defendant "had to have had something," but he did not know what it was. Kuntu added, "If it was by him or somebody else, I don't know exactly. *** So he must of [*sic*] grabbed something." After defendant ran

10

away, the commotion "died out at that point."

¶ 30    Shortly after the shooting, Kuntu saw a post on Facebook looking for information. He took down the information and called "Ms. Dixon." He met with her within a couple of months, but he did not sign his affidavit until 2017.

¶ 31    Defendant also testified on his own behalf. He was not aware of his trial counsel reaching out to witnesses. While his case was on direct appeal, defendant talked to his mother and siblings about reaching out on Facebook to see if they could find some people who were at the club and could testify on his behalf.

¶ 32    At the conclusion of the hearing, the postconviction court denied defendant's actual innocence claim and made its findings on the record. While the court found the evidence was newly discovered and material, it concluded that this evidence did not place the trial evidence in a different light or undermine the court's confidence in the guilty judgment. Specifically, the court found it was "problematic" that the testimony from Sanders, Madison, and Kuntu was "pretty vague on specifics" while "certain specifics in the affidavit[s] that were not [discussed] during their live testimony." The court continued:

> "They generally agree that the defendant was not the aggressor and that there was
> something going on inside and then something going on outside. In a general
> sense they basically all kind of have a similar story of there was something inside.
> To me it's not clear whether it's the defendant or not. But then outside [] the
> defendant is not the aggressor and that somehow the defendant shoots, but they
> don't know how the shooting happened but [only in] a general sense. So I find
> that in all of their testimony they were all impeached by their affidavits where
> their affidavit[s] are a lot more specific but they were not specific during their

testimony. So I do find that problematic."

¶ 33    The court further observed that their testimony was not of such a conclusive character to change the result on retrial. The court found issues in the identifications from all three witnesses because

> "the connection between that identification by these three [witnesses], especially the two who testified today didn't even know Mr. Dixon but somehow ten years later in an affidavit they're absolutely sure that it was Mr. Dixon who was not the aggressor, you know, the nexus between that identification that was presented I find problematic."

The court recounted that defendant testified at trial about what occurred, as well as two occurrence witnesses for the defense. The postconviction court pointed out that the trial judge heard this testimony and the witnesses' testimony was "the same general almost vague without any specifics about the defendant not being the aggressor ***." The postconviction court observed that the physical evidence supported the State's case, including the recovery of six .45-caliber cartridge cases matching the gun found with defendant when he was pulled over. The court then concluded that defendant did not meet his burden to show his new evidence placed the trial evidence in a different light and undermined the court's confidence in the judgment of guilt.

¶ 34    This appeal followed.

¶ 35    Defendant argues on appeal that the trial court erred in denying his postconviction claim of actual innocence following a third stage evidentiary hearing. Specifically, he contends that three new witnesses strongly bolstered his claim of self-defense and the court's denial of his claim was manifest error. The State maintains that the trial court's findings were not manifestly erroneous, and the court properly dismissed the petition.

¶ 36    The Post-Conviction Hearing Act (Act) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2020); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). The Act sets forth three stages for review of a defendant's claims. 725 ILCS 5/122-2.1, 122-6 (West 2020). This appeal comes to us following a third-stage evidentiary hearing.

¶ 37    At the evidentiary hearing, "the circuit court serves as the fact finder, and, therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts." *People v. Domagala*, 2013 IL 113688, ¶ 34. The defendant bears the burden of proof to show a denial of a constitutional right by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. A reviewing court will not reverse a postconviction court's findings of fact and credibility determinations unless the findings are manifestly erroneous. *People v. McCoy*, 2026 IL 131565, ¶ 50. " 'Manifest error' is error which is clearly plain, evident, and indisputable." *People v. Taylor*, 237 Ill. 2d 356, 373 (2010).

¶ 38    Defendant raised a single claim of actual innocence in his postconviction petition. To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; see also *People v. Jackson*, 2021 IL 124818, ¶ 41. "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Id.* Noncumulative evidence adds to the information that the fact

finder heard at trial. *Id.* "[T]he conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* This court "must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *People v. Sanders*, 2016 IL 118123, ¶ 47. The supreme court has "emphasized that the conclusive character of the new evidence is the 'most important element of an actual innocence claim.' " *McCoy*, 2026 IL 131565, ¶ 54 (quoting *Robinson*, 2020 IL 123849, ¶ 47). This court "may affirm the denial of the actual innocence claim based on the finding that the defendant failed to establish the conclusive character element." *Id*.

¶ 39     The circuit court reviews the evidence presented at the evidentiary hearing to determine whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id*. ¶ 55. This new evidence does not need to be entirely dispositive to be likely to alter the result on retrial, rather probability, not certainty, is the key by considering all the evidence, both new and old, together. *Id*. "Such assessment involves credibility determinations that are uniquely appropriate for trial judges to make, and we will not second-guess such credibility findings." *Id.*

¶ 40     Here, the postconviction court found defendant's new evidence was newly discovered and material, which the State does not contest. However, the court concluded that the new evidence was not of such conclusive character as to undermine its confidence in defendant's guilt. According to defendant, this finding was "egregiously wrong" because the testimony from his new witnesses greatly strengthened his self-defense claim. He asserts that the new witnesses corroborated defendant's account and contradicted Jones's trial testimony that defendant came home before returning to the club with a firearm.

¶ 41    We find the case relied on by the State, *People v. Carter*, 2017 IL App (1st) 151297, to be analogous. In that case, the reviewing court affirmed the denial of defendant's actual innocence claim following a third-stage evidentiary hearing. The defendant had been convicted of two counts of first degree murder after trial witnesses, including the surviving victim, identified defendant as the person who fired multiple shots into a vehicle killing the two victims. *Id.* ¶¶ 18-19, 45. At the evidentiary hearing, the defendant presented the testimony of two witnesses who stated the defendant was not the person who shot the victims and named another perpetrator. *Id.* ¶¶ 66, 84. In denying defendant's claim, the trial court found the witnesses' testimony lacked "credibility and, when scrutinized in the context of the entire trial record, it was not so persuasive that it would probably change the result on retrial." *Id.* ¶ 120.

¶ 42    On appeal, the defendant argued that the new witnesses' testimony—identifying another individual as the shooter—was "noncumulative, conclusive evidence that would likely change the result on retrial." *Id.* ¶ 122. The reviewing court held that under a manifest-error standard, "the trial court's ruling, which was based almost exclusively on a credibility determination, was not arbitrary or unreasonable." *Id.* ¶ 142. The *Carter* court observed that the trial court had found the two witnesses were "incredible" in part because while both men claimed to have been present for the shooting, neither came forward until many years after the defendant's conviction. *Id.* ¶ 143. Specifically, the reviewing court pointed to the trial court's observations that these witnesses knew the defendant, were members of the same gang, and had spent time together prior to the shooting, but they claimed not to have learned of the defendant's conviction for years. *Id.* The reviewing court concluded no manifest error occurred when the trial court determined that the new witnesses were not credible. *Id.* ¶ 146.

¶ 43    Similarly, in the present case, the postconviction court's ruling following an evidentiary

hearing was based on its credibility determinations. Significantly, all three of the new witnesses testified inconsistently with, and were impeached by, their own affidavits. The postconviction court repeatedly observed in its findings that each of the new witnesses provided vague testimony in contradiction to more specific details contained in each of their affidavits. Crucially, none of the witnesses testified that they saw defendant take a gun from one of his assailants, nor did they state that the other men fired the first shot.

¶ 44    In her affidavit, Sanders said she saw defendant being assaulted by three men, two of whom were armed with guns. She then saw defendant take a gun from one of the men, one of the other men fired a shot at defendant, and defendant fired a shot in return. She stated she heard 6 or 7 gunshots. In contrast, Sanders testified at the hearing that she could not say for certain where the first shots came from and she saw defendant and one of the security guards each had a gun.

¶ 45    Similarly, Madison stated in his affidavit that he "observed" defendant take the gun from one of the men and the other assailant then fired in defendant's direction. However, Madison testified that he could not see much and all he saw was three individuals coming toward defendant and defendant was trying to defend himself. He explicitly stated, "I didn't see him actually have a gun. He was defending himself. I didn't see him actually with the gun." Madison also did not see anyone fire a gun; he only heard the gunshots.

¶ 46    Kuntu also stated in his affidavit that defendant "disarmed" one of the men while the other assailant shot at defendant. While he hid behind his car, Kuntu then saw defendant fire a shot in response. At the hearing, Kuntu testified that defendant must have "grabbed something" because gunshots were going in both directions, but he also said, "If it was by [defendant] or somebody else, I don't know exactly."

¶ 47    Additionally, and similar to *Carter*, the witnesses indicated that they responded to a

Facebook post but did not sign affidavits until several years later. Sanders stated she saw a Facebook post after defendant was convicted and someone contacted her in 2012, but she did not sign her affidavit until 2019. Madison said he saw the post a few days after the shooting in 2007 and commented he was there, but he was not contacted for years and did not sign his affidavit until 2017. Kuntu, similarly, recounted seeing a post "not too long after" the shooting and met with a "Ms. Dixon" a few weeks to a month later, but he did not sign his affidavit until 2017. The postconviction court found the identifications by Madison and Kuntu to be "problematic," noting that both testified they did not know defendant "but somehow ten years later in an affidavit they're absolutely sure that it was [defendant] who was not the aggressor." As the postconviction court also observed, the affidavits were "a lot more detailed than what their testimony was."

¶ 48     In contrast, multiple trial witnesses testified for the State that defendant was armed when he approached Fuller outside the club. Jones testified defendant was upset over an altercation that had occurred at the Black Room and he returned to the club after arming himself. Notably, the trial court found Jones's testimony to be "the most believable." Further, Fuller testified that defendant appeared upset when he ran into him outside the club. According to Gladney, defendant disappeared after he was kicked out of the club but returned about 15 minutes later shouting outside the club shortly before Fuller approached him. Fuller and Gladney both testified that defendant was armed when he approached Fuller. Fuller and Fort also testified that defendant shot Fuller from a distance of two feet, and by defendant's own admission Fuller was "close" to him when he fired the gun. Fuller and Gladney's testimony was further corroborated by Champs and Fort. Both Champs and Fort testified to seeing defendant talking to Fuller near the corner of 61st and Vernon before gunshots were fired.

¶ 49    Notably, defendant's testimony that he fired the gun while he ran away was disproven by the physical evidence. It is undisputed that defendant fired all the bullets from the gun found in his possession and tested positive for the presence of GSR. The six recovered cartridge cases were found in close proximity to one another and matched the gun found in defendant's car. The trial court found defendant's testimony "strain[ed] the bounds of credibility." The postconviction court reached a similar conclusion.

¶ 50    After considering this new witness testimony along with the trial evidence, the postconviction court found the new evidence failed to undermine its confidence in the judgment of guilt. As the postconviction court observed, Sanders, Madison, and Kuntu each provided vague testimony regarding the circumstances leading to the shooting which contradicted their initial statements in their respective affidavits. None of the witnesses testified that they saw defendant take a firearm from one of the individuals, nor did they see who fired the first shot. Sanders testified that she could not "say for certain where the first shots came from." When the shots began, she "ducked down behind my car a little bit." Madison testified that he did not see defendant with a gun and "once I heard the first two gunshots I got in the car," and he did not see anyone shooting, he "just heard the gunshots." Kuntu gave similar testimony that he did not know who fired the first shot. This lack of any eyewitness testimony regarding who fired the first shot cannot overcome the three eyewitnesses who testified at trial that defendant fired first. As the postconviction court found, in light of their testimony and the circumstances surrounding it, defendant failed to meet his burden to place the trial evidence in a different light. Under a manifest error review, we hold that the trial court's finding was not arbitrary or unreasonable. See *Carter*, 2017 IL App (1st) 151297, ¶ 142.

¶ 51    For the foregoing reasons, we find that the postconviction court's ruling was not

manifestly erroneous and affirm the court's third-stage dismissal of defendant's postconviction petition.

¶ 52    Affirmed.